FARMERS COOPERATIVE CO. v. BIR-
MINGHAM, Collector of Internal
Revenue.

Civ. No. 537.

United States District Court
N. D. Iowa, W. D.

Sept. 19, 1949.

As Amended Oct. 8, 1949.

Alan Loth (of Loth & Melton), Fort Dodge, Iowa, for plaintiff.

Tobias E. Diamond, United States District Attorney, Wm. B. Danforth, Assistant United States District Attorney, Sioux City, Iowa, and Ruppert Bingham, Special Assistant to Attorney General, for defendant.

GRAVEN, District Judge.

Suit by a taxpayer for refund of federal income, excess profits and declared value excess profits taxes and interest thereon paid pursuant to a deficiency assessment by the defendant Collector against the taxpayer for the fiscal year of the taxpayer ending October 31st, 1944, involving the question of the exclusion of a patronage dividend from the taxable income of the taxpayer. This action was originally brought in the Southern District of Iowa. It was transferred to this District under the provisions of Section 1404(a) of the Revised Judicial Code, 28 U.S.C.A.

Plaintiff, hereinafter referred to as taxpayer, is a farmers cooperative association whose place of business is at Greenfield in Adair County, Iowa. The taxpayer was originally organized as a stock corporation under the chapter of the Iowa Code relating in general to the incorporation of organizations for pecuniary profit and it continued under that form of organization until February 8th, 1944. On February 8th, 1944, at a stockholders' meeting the taxpayer reorganized as a nonstock agricultural cooperative under Section 8512.43 of Chapter 390.1 of the Code of Iowa 1939, presently Chapter 499 of the Code of Iowa 1946, I.C.A. § 499.43. The taxpayer was both an agricultural marketing and agricultural purchasing cooperative organization handling livestock, grain, farm supplies and equipment, and similar merchandise. At the time of its reorganization provision was made for the exchange of membership and interest certificates for all outstanding shares of stock. Prior to October 31st, 1944, this plan was carried out, so that on October 31st, 1944, the taxpayer had no capital stock outstanding, and there were on that date no obligations existing or claimed arising out of the reorganization, either to any stockholder or to any other person.

On November 3d, 1944, three days after the close of taxpayer's fiscal year, an accountant employed by the taxpayer completed his audit of taxpayer's books, and at a special directors' meeting held on that date the following motion was adopted: "Motion by Sieg seconded by Shirk that a deferred dividend be set up to the members at the rate of a cent a bushel on grain eight percent on merchandise and six-tenths of one percent on livestock. Motion carried." Though the taxpayer reports on the accrual basis no action had been taken by its directors prior to November 3d, 1944, with respect to the declaration or allocation of any dividends for taxpayer's fiscal year ending October 31st, 1944.

The deferred dividend provided by taxpayer's board of directors amounted to $5913.14 and was set up on taxpayer's books as "Patronage Dividend Payable." Each member's share was computed and credited to his individual account on the patronage ledger of the taxpayer as of November 4th, 1944. In computing the dividend of the members, they were given credit for the amount of business done with the taxpayer for the period from February 8th, 1944, to October 31st, 1944, which was the period during which the taxpayer was operating under the Iowa laws relating to cooperatives. In addition, they were given credit for the amount of business done with the taxpayer during the period from November 1st, 1943, to February 8th, 1944, when they were stockholders of the taxpayer while it was operating as a stock corporation. A portion of the taxpayer's profit for its fiscal year 1943–1944 came from transactions with nonmembers. It is the claim of the taxpayer that it withheld from the patronage dividend an amount equal to the profits made from transactions with nonmembers, so that no profits from business transacted with nonmembers was included in the dividend. The members were informed of the credits to their accounts at the annual membership meeting in February, 1945. Pursuant to appropriate resolutions of taxpayer's board

of directors dated January 5th, 1946, and November 6th, 1946, 60 percent of the deferred dividend was paid to the members on January 31st, 1946, and the balance was paid on February 17th, 1947.

The taxpayer's earnings before taxes for the year ending October 31st, 1944, amounted to $16,372.53. On January 16th, 1945, the taxpayer paid corporation income, excess profits and declared value excess profits taxes on its taxable income for its fiscal year ending October 31st, 1944, in the amount $2619.21. In computing its taxable income the taxpayer excluded therefrom the dividend credited to its members on November 4th, 1944, in the sum of $5913.14. The Commissioner disallowed this exclusion and on January 2d, 1947, imposed a deficiency assessment against the taxpayer in the amount of $4627.25. The taxpayer paid the deficiency. On November 20th, 1947, the taxpayer filed a claim for refund with the Commissioner. No action was taken by the Commissioner during the ensuing six months' period. On June 18th, 1948, the taxpayer brought this action to recover $4324.96. The difference between the amount of the deficiency assessment and the amount sought to be recovered is occasioned by adjustment of minor items. All of the $4324.96 sought to be recovered by the taxpayer in this action arises from additional taxes assessed by the Commissioner because of the denial by him of the taxpayer's claim for exclusion from its income of the patronage dividend in question.

Since taxpayer transacted business with both members and nonmembers but only allocated patronage dividends to member patrons, it was not entitled to and does not claim the statutory exemption accorded some farmer cooperatives by Section 101 (12) of the Internal Revenue Code, 26 U.S. C.A. § 101(12). The controversy between the defendant Collector and the taxpayer is as to whether the taxpayer could exclude from its taxable income the amount allocated and subsequently paid as a patronage dividend. The said patronage dividend was derived from the earnings of the taxpayer for the period from November 1st, 1943, to October 31st, 1944.

The defendant Collector contends that the taxpayer could not legally include in the patronage dividend any amount derived from business transacted with the present members prior to February 8th, 1944. In support of this position the Collector points out that merely being a stockholder in the original stock corporation does not confer on that stockholder, who subsequently becomes a member of the reorganized successor, cooperative corporation, the status of a member toward the income earned by the organization while it was a stock corporation. In other words, it is the claim of the defendant Collector that membership in the cooperative has no retroactive effect for any period prior to the time such membership was obtained and so far as the present members are concerned the income of the stock corporation for the period November 1st, 1943, to February 8th, 1944, was derived from transactions with nonmembers. The Collector further argues that during the period the taxpayer functioned as a stock corporation it was under no obligation either by statute or its articles of incorporation to pay any of its stockholders any patronage dividends.

The taxpayer and the Collector are also in disagreement as to the exclusion of that amount of the dividend credited to the members based upon business transacted by the members during the period the taxpayer functioned as a cooperative from February 8th, 1944, to the end of its fiscal year on October 31st, 1944.

It has been heretofore noted that the corporate action of the taxpayer relating to the declaration of the patronage dividend in question was not taken until after the end of the taxpayer's fiscal year and that the patronage dividend was not credited to the member patrons until after the end of such fiscal year. It is the contention of the taxpayer that no corporate action formally declaring such patronage dividend was necessary to make it excludable for federal income tax purposes since under the applicable Iowa statute and its own articles of incorporation the taxpayer was obligated to allocate patronage dividends to its member patrons.

The Collector's position on this point is that neither the applicable state statutes nor taxpayer's articles of incorporation created an obligation on the part of the taxpayer to pay or to allocate to its member patrons the patronage dividend in question and that until the board of directors acted there was neither an obligation on the part of the taxpayer to allocate a patronage dividend nor a right in its member patrons to receive such a dividend. In addition, the Collector claims that the statutes and articles vested such discretion in the taxpayer's board of directors that they had the right to declare or not to declare distributions of earnings to members, as they saw fit, thus further negativing any pre-existing obligation to allocate its earnings to member patrons which taxpayer might claim to have.

The determination of the questions involved in the present case would seem to require a study of considerable of the history and background of farmer cooperatives and the numerous statutory provisions relating to them.

The growth of farmer cooperatives throughout the United States has been very rapid, and it is estimated that today from one-third to one-half of the nation's farmers are cooperative members. Voorhis, Recent Trends in Urban Cooperative Development, 13 Law and Contemporary Problems 458, Duke University (1948). In 1913 there were 2,988 farmer marketing cooperative associations and 111 farmer purchasing cooperatives. Two years later, in 1915, these had increased to 5,149 farmer marketing cooperatives with a membership of 591,683 and 275 farmer purchasing cooperatives with 59,503 members. By the years 1943-1944 there were 7,522 farmer marketing cooperatives with 2,730,000 members and 2,778 farmer purchasing cooperatives with 1,520,000 members, or a total membership of 4,250,000. In 1913 farmer marketing cooperatives did an estimated $304,385.00 business while farmer purchasing cooperatives did $5,928.00 business. This had increased in 1943-1944 to $4,430,000,000.00 for farmer marketing and $730,000,000.00 for farmer purchasing cooperatives. House Report No. 1888, 79th Cong., 2nd Sess.

(April 7th, 1946) Competition of Cooperatives with Other Forms of Business Enterprise, and authorities cited therein. It has been estimated that by 1947 there were approximately 1,040 farm cooperatives in Iowa, with about the same number of non-farm cooperatives, most of the latter being consumer cooperatives. See Note 34 Iowa Law Review 340, 341 (1948). Farmer cooperatives have been and are of increasing economic importance. It is of interest to note that a case book dealing with cooperatives and their organizational, functional, and legal problems is now available for a law school course. Stedman, Bunn's Cases and Materials on Cooperative Associations (2nd ed., 1942). Cooperatives in general and their relation to the tax laws in particular have been and are subjects of wide interest and about which much has been written. For an especially valuable discussion dealing with various phases of cooperatives and cooperative law see 13 Law and Contemporary Problems 391-551, Duke University (1948). For discussions of state statutes and Tax Commission regulations pertaining to farmers' cooperatives under the Iowa income and property tax laws see Notes, 33 Iowa Law Review 123 (1947), and 34 Iowa Law Review 340 (1949). For rulings on certain of the requirements which an Iowa cooperative must comply with, see [1944] Opinions of the Iowa Attorney General, p. 40; [1942] Opinions of the Iowa Attorney General, p. 65. For an extensive discussion of the arguments for and against the taxation of cooperative receipts see, Sowards, Should Cooperatives Pay Federal Income Taxes?, 19 Tennessee Law Review 908 (1947). See also, House Report No. 1888, supra; Bradley, Taxation of Cooperatives, Harvard Business Review 576 (Autumn, 1947); Packel, The Law of The Organization and Operation of Cooperatives (2nd ed. 1947), reviewed by Professor L. K. Tunks in 33 Iowa Law Review 437 (1948); Packel, Cooperatives and the Income Tax, 90 University of Pennsylvania Law Review 137 (1941); Note, 34 Virginia Law Review 314 (1948) and Comment, 50 Harvard Law Review 1321 (1937). The writers of the Virginia and Harvard Law Review articles cited above suggest that in case ex-

clusion of patronage dividends was denied a cooperative, it could still avoid being taxed on its earnings by charging patrons less than cost for its products or paying more than the market price to producers so that there would be a deficit at the end of the year rather than a surplus. Operating capital which would offset this deficit could allegedly be secured by requiring capital investments from patrons on the basis of their patronage. There are a number of A.L.R. annotations on the subject of cooperatives. See annotations to the cases of Phez Co. v. Salem Fruit Union, 1921, 103 Or. 514, 201 P. 222, 205 P. 970, 25 A.L.R. 1090; Tobacco Growers' Co-operative Ass'n v. Jones, 1923, 185 N.C. 265, 117 S.E. 174, 33 A.L.R. 231; Tobacco Growers' Co-operative Ass'n v. Harvey & Son Co., 1925, 189 N.C. 494, 127 S.E. 545, 47 A.L.R. 928; Watertown Milk Producers Co-operative Ass'n v. Van Camp Packing Co., 1929, 199 Wis. 379, 225 N.W. 209, 226 N.W. 378, 77 A.L.R. 391; Neith Co-operative Dairy Products Ass'n v. National Cheese Producers' Federation, 1934, 217 Wis. 202, 257 N.W. 624, 98 A.L.R. 1403; Yakima Fruit Growers' Ass'n v. Henneford, 1935, 182 Wash. 437, 47 P.2d 831, 100 A.L.R. 435; Tigner v. State of Texas, 1940, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124, 130 A.L.R. 1321.

It seems apparent that some of the public confuse the question of the so-called "cooperative exemption" from federal income tax with the question of the exclusion from a cooperative's gross income of what are commonly known as "patronage dividends" for federal income tax purposes. Congress has made specific statutory provision for the exemption from federal income tax of those cooperatives which meet certain specified requirements. However, there is no federal statute which specifically authorizes the exclusion of patronage dividends for federal income tax purposes. Such exclusion has been permitted by Treasury Department rulings and by decisions of federal courts other than the United States Supreme Court. The United States Supreme Court has never passed upon the legality of excluding patronage dividends for federal income tax purposes.

While the matter of the so-called "cooperative exemption" is dissimilar from the matter of the exclusion of patronage dividends by cooperatives for federal income tax purposes, yet the statutes, rulings, and decisions relating to the so-called "cooperative tax exemption" do throw light on questions having to do with patronage dividends.

The so-called cooperative exemption from federal income tax, which is only extended to those cooperatives meeting certain requirements, has been included in one form or another in all the federal revenue acts passed since the adoption of the Sixteenth Amendment.

Section II G(a) of the first Federal Revenue Act of 1913, 38 Stat. 172, exempted from income tax agricultural and horticultural cooperative marketing associations and Article 92, Regulations 33 promulgated under the 1913 Act provided for the exemption of cooperative dairies meeting certain standards. The Treasury Regulations of the Revenue Acts of 1916-1918 gave rather liberal interpretations to the less specific terms of the Revenue Acts for those years in exempting from income tax those farmers' and fruit growers' marketing associations which could show that they had no net income upon their own account and that the entire proceeds of their sales, less selling expenses, were returned to their members upon the basis of the quantity of products furnished by them. This was in line with recognized practice since the function of a treasury regulation is to consistently and reasonably carry into effect the will of Congress as generally expressed but not explicitly stated in the statute. Manhattan General Equipment Co. v. Commissioner, 1936, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528, rehearing denied 297 U.S. 728, 56 S.Ct. 587, 80 L.Ed. 1010. See also Korth v. Mountain City Copper Co., 10 Cir., 1949, 174 F.2d 295.

The Revenue Act of 1921, Section 231 (11), 42 Stat. 253, contained provisions similar to the 1918 Act, 40 Stat. 1057 et seq., but in addition specifically exempted farmers' purchasing cooperatives from income tax.

The Treasury Regulations promulgated under the 1921 and 1924 Acts further liberalized the provisions of the earlier regulations by providing that (a) the maintenance of reasonable reserves for depreciation or possible loss, or a sinking fund, or surplus to provide for the erection of buildings or facilities required in the business, or for the purchase and installation of machinery and equipment, or to retire indebtedness would not destroy the exemption, and (b) farmer cooperatives would not lose their exemption by virtue of having capital stock upon which they paid a dividend not exceeding the legal rate, or 8 percent per annum, nor (c) because they marketed the products of nonmembers, provided the value of the products marketed for nonmembers did not exceed the value of products marketed for members. Section 231(11), Revenue Act of 1924, 43 Stat. 282, was substantially the same as Section 231(11) of the 1921 Act, and Section 231 (12) of the Revenue Act of 1926, 44 Stat. 40, followed largely the liberal regulations promulgated under the 1924 Act.

The corresponding provisions in the Revenue Acts and the Treasury Regulations down to the present day have been substantially the same. Section 101(12) of the present Internal Revenue Code, 53 Stat. 4, 33, 26 U.S.C.A. § 101(12), establishes the requirements for tax exemption of cooperatives for federal income tax purposes as follows:

1. They must be organized by farmers on a cooperative basis.

2. They must operate as a marketing or purchasing agency on a cost basis, ultimately turning back all net proceeds to member and non-member patrons.

3. Substantially all stock except non-voting, nonprofit-sharing preferred stock must be owned by producers or purchaser member patrons.

4. Dividends may not exceed 8 percent or the legal rate in the state of incorporation, whichever is greater.

5. Only reserves required by state law, or reasonable reserves for a necessary purpose may be accumulated.

6. Neither the cooperative nor its member patrons may gain a discriminatory advantage on non-member business.

7. Non-member business must not exceed member business and purchasing cooperatives are limited in their purchases for non-member nonproducer patrons to 15 percent of their total business.

Section 29.101(12)–1 as amended by T. D. 5458, June 15th, 1945, is the applicable Treasury Regulation and among other things retains the provision limiting this exemption to farmer cooperatives, for subsection (d) provides that, "Cooperative organizations engaged in occupations dissimilar from those of farmers, fruit growers, and the like, such as marketing building materials, are not exempt."

The association must be organized and operated in the prescribed manner and for the purposes specified to be tax exempt. Burr Creamery Corp. v. Commissioner, 1931, 23 B.T.A. 1007, affirmed 9 Cir., 1932, 62 F.2d 407, certiorari denied, 1933, 289 U.S. 730, 53 S.Ct. 527, 77 L.Ed. 1479; Producers' Creamery Co. v. United States, 5 Cir., 1932, 55 F.2d 104; Riverdale Cooperative Creamery Ass'n v. Commissioner, 9 Cir., 1931, 48 F.2d 711. However, if the cooperative is organized in such a way that it can meet the requirements of the statute in regard to equality of treatment between member and non-member patrons, the presence of additional charter powers will not cause the cooperative to lose its exemption. I.T.1914, C.B. III-1 (1924) 287; S.M. 2286, C.B. III-2 (1924) 236. In Fruit Growers' Supply Co. v. Commissioner, 1930, 21 B.T.A. 315, affirmed 9 Cir., 1932, 56 F.2d 90, page 91, the court stated: "It is conceded that the corporate powers of the petitioner are a great deal broader than those indicated in the statute, but it is correctly contended that, where the organization actually operated as a purchasing agent for the purposes defined in the statute, it is entitled to exemption, notwithstanding the fact that its powers exceeded those found in the statute (cit.)."

The mere fact that a farmer cooperative is organized under state cooperative stat-

utes is not sufficient in and of itself to bring such organization within federal statutes exempting farmer cooperatives from taxation. Farmers Union Co-operative Co. v. Commissioner, 1935, 33 B.T.A. 225, affirmed 8 Cir., 1937, 90 F.2d 488. And where the cooperative discriminates between member and non-member patrons in the allocation or distribution of its earnings the exemption will be denied. Fertile Co-operative Dairy Ass'n v. Huston, 8 Cir., 1941, 119 F.2d 274; Farmers Co-operative Co. of Wahoo, Neb., v. United States, 1938, 23 F.Supp. 123, 87 Ct.Cl. 154; Producers' Creamery Co. v. United States, supra; Council Bluffs Grape Growers Ass'n v. Commissioner, 1941, 44 B.T.A. 152; Farmers Mutual Cooperative Creamery v. Commissioner, 1935, 33 B.T.A. 117; Central Cooperative Oil Ass'n v. Commissioner, 1935, 32 B.T.A. 359; Cf. San Joaquin Valley Poultry Producers Ass'n v. Commissioner, 9 Cir., 1943, 136 F.2d 382. However, such discrimination is not violative of the rights of the patrons discriminated against. Mooney v. Farmers' Mercantile & Elevator Co., 1917, 138 Minn. 199, 164 N.W. 804.

The exemption may de denied because of inequality in the treatment of member patrons. Farmers Union Cooperative Oil Co. v. Commissioner, 1938, 38 B.T.A. 64. But in the case of a non-member patron a cooperative can apply on the payment for a share of stock for the non-member patron or for his membership in the association that part of its earnings which accrue to the business of such a nonmember, and not lose its exemption. G.C.M. 11068, C. B. XII-1 (1933) 122; I.T. 2791, C.B. XIII-1 (1934) 77. A federated type of cooperative may be exempt if it qualifies otherwise, I.T. 2000, C.B. III-1 (1924) 290; S.M. 2595, C.B. III-2 (1924) 238; S.M. 2286, C.B. III-2 (1924) 236, but where a cooperative was composed in part of consumer cooperatives it was held non-exempt. Co-operative Central Exchange v. Commissioner, 1932, 27 B.T.A. 17. A cooperative association which paid a 10 percent dividend to its stockholders and which also accumulated large surplus and reserve accounts was denied an exempt status because of such ac-

tions in South Carolina Produce Ass'n v. Commissioner, 4 Cir., 1931, 50 F.2d 742. Transacting more than the prescribed volume of business with nonmembers may also cause the cooperative to lose its exempt status. Farmers Union Co-operative Ass'n v. Commissioner (1941) 44 B.T.A. 34; Farmers Co-operative Grain & L. Ass'n v. Hildreth (1942) B.T.A.Memo., Docket No. 98281, P. H., par. 42,030.

The Attorney General of Iowa has ruled that ordinary corporations for profit, cooperative associations not organized under Chapter 390.1, Code of Iowa 1939, Chapter 499 Code of Iowa 1946, I.C.A. § 499.1 et seq., partnerships, cities, towns, counties or townships are not eligible for membership in a cooperative association organized under Chapter 390.1, Code of Iowa 1939. [1946] Opinions of Iowa Attorney General, p. 21.

There is no partial tax exemption. Farmers Union Cooperative Oil Ass'n v. Commissioner, supra. Either the cooperative meets the requirements for exemption as stated in the statute and regulations, or the most that it can claim is an exclusion from gross income of that part of its earnings allocated or distributed as a patronage dividend in accordance with the administrative practice of the Treasury Department and court decisions recognizing that practice.

It is important to note that to comply with the cooperative exemption statute the cooperative may not market products or purchase supplies for nonmembers in a greater amount than that marketed or purchased for members. And purchases made for persons who are neither members nor producers must not exceed fifteen percent of the value of all purchases. These requirements would seem to be among the most difficult for cooperatives to comply with, for Justice Brandeis in his dissent in Frost v. Corporation Commission, 1929, 278 U.S. 515, 528, page 545, 49 S.Ct. 235, page 246, 73 L.Ed. 483, stated that, "Experience has demonstrated * * * that doing business for nonmembers is usually deemed essential to the success of a cooperative (cit.). More than five-sixths of all the farmers' co-operative associations

in the United States do business for non-members." It might be noted here parenthetically that this differs greatly from the English situation, for a writer in an English publication stated that only two percent of the business of English co-operatives was conducted with nonmembers. Crichton, Cooperative Societies and the Income Tax, 38 Law Quarterly Review 48 (1922).

Because of these and other statutory restrictions, "A surprisingly large number of farmer cooperatives have elected not to qualify for income tax exemption, but operate as taxpaying corporations. Apparently, farmers owning such cooperatives do not care to be fettered or restricted by the rigid limitations imposed by law on exempt cooperatives." House Report No. 1888, supra at p. 16. Of the 10,300 agricultural cooperatives doing business in 1945 the Treasury Department reported that approximately 54 percent qualified for tax exemption. House Report No. 1888, supra at p. 19 fn. 3.

The provision in Section 499.30 of the Code of Iowa 1946, I.C.A., set out infra, that patronage dividends can only be allocated to *members* would seem to further increase the difficulties of an Iowa cooperative attempting to attain an exempt status under Section 101(12) of the Internal Revenue Code, 26 U.S.C.A. § 101 (12), which, as stated previously, requires equality of treatment between member and non-member patrons as one of the prerequisites for exemption. It would seem that an Iowa cooperative must specifically provide in its charter or its by-laws that no business will be transacted with nonmembers, or it must be able to prove that its business was conducted only with members, in order to meet the requirements both of Section 499.30 and Section 101(12). In Eugene Fruit Growers Ass'n v. Commissioner, 1938, 37 B.T.A. 993, the Board of Tax Appeals held that the fact that no provision was made for profit sharing by nonmembers did not affect petitioner's exempt status where all of its contracts were with members. And apparently a non-member patron would be unsuccessful in an attempt to force the cooperative to distribute a portion of its earnings to him, in the absence of any provision in the co-operative charter or by-laws allowing such distribution, for the court in Farmers Truck Ass'n v. Strawberry & Vegetable Auction, Inc., La.App., 1935, 163 So. 181, held that a non-member patron could not compel the association to pay him a patronage dividend where its organization papers and procedure did not provide for doing so. Since apparently only a few Iowa cooperatives, notably organizations handling dairy products, do not transact business with at least some nonmembers, the major problem so far as the tax situation for federal income tax purposes of Iowa cooperatives is concerned would not seem to be one occasioned by the so-called cooperative exemption, but rather the matter of the excludability of patronage dividends from the gross income of those cooperatives claiming such exclusions under the administrative practice of the Treasury Department, and court decisions in accord therewith.

One writer has made an interesting analysis in general terms of the relative advantages of farmer cooperatives exempt and non-exempt from federal corporate income tax. Foley, 25 Taxes 197, 199 (1947).

| "Non-Exempt | Exempt |
|---|---|
| 1. Must file regular corporate income tax Form (1120). | 1. Must obtain letter of exemption from Commissioner and then file Form 990 annually. |
| 2. Must pay tax on such taxable income as: | 2. Does not pay such taxes. |
| a. Non-operating or extraneous income or capital gains. | a. No tax. |
| b. Reserved operating earnings. | b. No tax, but subject to limitations. |
| c. All operating earnings not distributed in prescribed manner. | c. Must allocate operating savings to all patrons on a patronage basis. |
| d. All earnings distributed as interest or dividends on capital stock. | d. No tax, but subject to limitations. |
| e. All earnings done for U. S. A. or its agencies, if not refunded to them. | e. May distribute to all other patrons, or (sic) patronage basis. |

210

| "Non-Exempt | Exempt |
|---|---|
| 3. Must purchase and affix excise stamps to certain documents. | 3. Not required. |
| 4. No Social Security preference. | 4. Have very limited exemption on this tax. |
| 5. Must maintain each year its legal and corporate basis for excluding refunds from gross income. | 5. Must adhere to requisites for exemption at all time during subject year. |
| 6. May pay any rate of dividend or interest on capital shares (but is taxed on amounts so paid or accrued). | 6. Rate is limited to state rate or 8%. |
| 7. May have unlimited capital reserves (after income tax thereon is paid). | 7. Must limit such reserves and allocate them to patrons on patronage basis. |
| 8. Must maintain patronage records. | 8. Must maintain patronage and allocation records. |
| 9. Owned and controlled by anyone. | 9. Must be substantially controlled by producer-patrons. |
| 10. May operate in part commercially and in part cooperatively. | 10. Must operate 100% cooperatively. |
| 11. May engage in any type of business. | 11. Must adhere to requisites for exemption. |
| 12. May do business with anyone. | 12. Must adhere to requisites for exemption. |
| 13. Regular two-year carry-over and carry-back provision on losses. | 13. More flexible treatment for losses of any year." |

The foregoing brings sharply into focus the distinction between those cooperatives which enjoy the cooperative exemption from federal income tax and cooperatives which do not have such exemption but seek to exclude patronage dividends from their taxable income for federal income tax purposes. It must be kept in mind that it is only those cooperatives which do not desire or are unable to meet the statutory requirements for cooperative exemption which are interested in availing for themselves patronage dividend exclusions.

What constitutes a cooperative and a determination of the class of organization to which it belongs are matters which have given rise to some difficulty. While cooperatives today are generally incorporated, according to the latest available report about 10 percent of all farmer cooperatives are still unincorporated. A Statistical Handbook of Farmers Cooperatives, Farm Credit Administration, p. 8 (1939). The first incorporated cooperatives were formed as stock companies under statutes which had not been enacted specifically for the incorporation of cooperative organizations. Statutory provision for the organization of nonstock cooperatives was a later development. Nieman, Revolving Capital in Stock Cooperative Corporations, 13 Law and Contemporary Problems 393, 394, Duke University (1948). It was stated informally in argument in the present case that the largest distributors of patronage dividends in Iowa are not incorporated under the Iowa laws relating to cooperatives.

An eminent jurist has said that any definition of a cooperative is not too practical because no one plan of organization is to be labeled as truly cooperative to the exclusion of others. Justice Brandeis in a dissenting opinion in Frost v. Corporation Commission, 1929, 278 U.S. 515, 546, 49 S.Ct. 235, 246, 73 L.Ed. 483, 499 commented on in 29 Columbia Law Review 833 (1929). It has been stated that an agricultural cooperative is a unique type of business organization operated for the mutual benefit of its members on the basis of their patronage with the association rather than because of any financial investment made therein, and that the primary purpose of a farmer cooperative is either to market the products of each producer patron and to return to him as much as possible for the product he sells, or to provide each purchasing patron with the kind and quantity of farm supplies needed at the lowest possible cost; or to accomplish both of these objectives. Paul, The Justifiability of The Policy of Exempting Farmers' Marketing and Purchasing Cooperative Organizations from Federal Income Taxes, 29 Minnesota Law Review 343 (1945). Incorporated cooperatives on occasion have been distinguished from the ordinary business corporation. In Doss v. Farmers' Union Cooperative Gin Co., 1935, 173 Okl. 70, page 71, 46 P.2d 950, page 951, the Court

stated, "* * * a co-operative corporation is a special and peculiar form of business enterprise which is not within the class of corporation designed purely and solely for money profit." The Arkansas Supreme Court held that a cooperative corporation was not liable for the torts of its employees in Arkansas Valley Cooperative Co-op. Rural Electric Co. v. Elkins, 1940, 200 Ark. 883, 141 S.W.2d 538. It is indicated that cooperative corporations in general possess many of the essential attributes of ordinary business corporations, the most noticeable differences being in the matters of voting power and the basis of distribution of their net earnings. In the cooperative corporation each member or stockholder has one vote regardless of the number of shares he may hold, whereas each share of stock is entitled to one vote in the ordinary business corporation. There are also nonstock cooperatives which issue membership certificates to their members. The business corporation usually divides part of its profits among its shareholders in proportion to the shares owned, while a cooperative corporation, after distributing part of its profits to shareholders in the form of a dividend not exceeding a rate generally fixed by statute, distributes the remainder in proportion to the volume of members' purchases and sales. Because of a definite and limited return accruing to an investor in a cooperative, his status has been distinguished from that of a stockholder in a business corporation and analogized rather to that of a bondholder. Albrecht, Economic Theory of Consumers' Cooperation, 191 Annals of the American Academy of Political and Social Science 17 (1937). See also, Justice Brandeis' dissent in Frost v. Corporation Commission, supra. The United States Courts of Appeal for the Sixth and Seventh Circuits in the cases of In re Wisconsin Cooperative Milk Pool, D.C. E.D. Wis.1940, 35 F.Supp. 787, reversed 7 Cir., 1941, 119 F.2d 999, certiorari denied Wisconsin Co-op. Milk Pool v. First Wisconsin Nat. Bank of Milwaukee, 314 U.S. 655, 62 S.Ct. 105, 86 L.Ed. 525, and Schuster v. Ohio Farmers' Co-op. Milk Ass'n, 6 Cir.,

1932, 61 F.2d 337, analogized a cooperative to an ordinary business corporation for purposes of determining the cooperative's amenability to the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. In Lake Region Packing Ass'n v. United States, 5 Cir., 1944, 146 F.2d 157, a cooperative was held to be subject to the provisions of the Social Security Act, 42 U.S.C.A. § 301 et seq., like an ordinary corporation. The ordinary business corporation is taxed on its income and its stockholders are also taxed on that portion of the corporate earnings distributed to them by way of dividends. Likewise, both the non-exempt stock cooperative and its stockholders are taxed on amounts which the non-exempt cooperative distributes as dividends on its capital stock. Sacred Heart Cooperative Mercantile Co. v. Commissioner, 1925, 2 B.T.A. 24; Farmers Cooperative Ass'n v. Commissioner, 1926, 5 B.T.A. 61; Trego County Cooperative Ass'n v. Commissioner, 1927, 6 B.T.A. 1275; S.M. 2595, C.B. III-2 (1924) 238. However, the non-exempt cooperative may escape taxation on amounts distributed as patronage dividends if certain conditions are met. See Treasury rulings and cases cited infra.

It has been the policy in general of both Congress and the legislatures of the different states to enact legislation favorable to the formation and growth of farmer cooperatives. Tigner v. State of Texas, 1940, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124, 130 A.L.R. 1321; Liberty Warehouse Co. v. Burley Tobacco Growers' Co-operative Marketing Ass'n, 1928, 276 U.S. 71, 48 S.Ct. 291, 72 L.Ed. 473 (containing extensive citations of cases indicating general state approval of a policy favoring rural cooperatives); Stark v. Brannan, D.C. 1949, 82 F.Supp. 614, 617; Note, 22 Notre Dame Lawyer 413 (1947). Today every state has passed rather broad agricultural cooperative association acts. For a collection of the state statutes see Jensen, The Bill of Rights of U.S. Cooperative Agriculture, 20 Rocky Mountain Law Review 3, 13 fn. 29 (1948).

A distinction should be noted between "farmer cooperatives" and "consumer cooperatives" as each phrase has acquired

a distinct meaning through judicial interpretation and through usage in legal writings. Stedman, Bunns' Cases and Materials on Cooperative Associations, supra, p. 41, contains a quotation to the effect that state legislators in some instances have not had this distinction in mind and consequently have lumped the two types together under the inclusive term of "cooperatives." Farmer cooperatives consist only of those associations which market agricultural products or purchase supplies and equipment for those engaged in marketing agricultural products. National Outdoor Advertising Bureau v. Helvering, 2 Cir., 1937, 89 F.2d 878; Sunset Scavenger Co. v. Commissioner 9 Cir., 1936, 84 F.2d 453. A further distinction should be noted between farmer marketing cooperatives and farmer purchasing cooperatives. In the case of marketing cooperatives a patronage dividend has the effect of increasing the amount received for products marketed, while in the case of consumer or purchasing cooperatives a patronage dividend has the effect of reducing the cost of merchandise purchased. Farmer cooperatives similar to the taxpayer in the present case frequently act in the dual capacity of both a marketing cooperative and a purchasing cooperative. They are not thereby considered as forfeiting any claim they might otherwise have to either the cooperative exemption or the exclusion of patronage dividends from gross income. As heretofore noted, there is no federal statute which expressly provides for the exclusion of patronage dividends, but the exclusion of such dividends under certain conditions has been the administrative practice of the Treasury Department and the Bureau of Internal Revenue. T.D. 2737, June, 1918; I.T. 1499, C.B. I-2 (1922) 189; I.T. 1566, C.B. II-1 (1923) 85; A.R.R. 6967, C.B. III-1 (1924) 287; S.M. 2288, C.B. III-2 (1924) 233; S.M. 2595, C.B. III-2 (1924) 238; G.C.M. 12393, C.B. XII-2 (1933) 398; G.C.M. 17895, C.B. 1937-1, 56; I.T. 3208, C.B. 1938-2, 127.

This practice has in turn been recognized and approved by the courts. "* * * there is no * * * statutory provision for the deduction of patronage dividends from the gross income of a cooperative association. The Treasury Department, however, * * * has allowed such deductions 'to the end that substantial justice may be done. * * *'" Midland Cooperative Wholesale v. Commissioner, 1941, 44 B.T.A. 824, 830. See also, Co-operative Oil Ass'n v. Commissioner, 9 Cir., 1940, 115 F.2d 666; Anamosa Farmers Creamery Co. v. Commissioner, 1928, 13 B.T.A. 907; United Cooperatives, Inc., v. Commissioner, 1944, 4 T.C. 93, and other cases discussed infra.

The first Treasury Department ruling pertaining to the exclusion of patronage dividends or refunds made by cooperatives to its patrons, T.D. 2737, supra, did not purport to be based upon a specific section or sections of any Revenue Act. I.T. 1499, supra, and several of the subsequent Treasury Department rulings cited above were apparently issued under those sections of the Revenue Acts for the respective years providing for the exemption for federal income tax purposes of those farmer cooperatives meeting certain qualifications. It is interesting to note that the so-called "Iowa ruling," I.T. 3208, supra, which is the most recent ruling on the excludability of patronage dividends from a cooperative's gross income, was issued under Section 22 (a) of the Internal Revenue Code, 26 U.S.C.A. § 22(a), and is entitled, "What included in gross income." These Treasury Department rulings do not exist in a legal vacuum sealed off from the Internal Revenue Code, and they are not legal Robinson Crusoes isolated from that Code. Since they do not pertain to the statutory exemption granted some cooperatives by Section 101 (12) of the Internal Revenue Code, 26 U.S.C.A. § 101(12), they must relate to some other section of the Revenue Code. The fact that earnings are not taxable under some specific section of the Revenue Code does not preclude the possibility of their being taxed under the provisions of Section 22(a) of the Revenue Code, 26 U.S.C.A. § 22(a), relating to the taxability of income in general. See, Commissioner v. Smith, 1945, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830, rehearing denied

324 U.S. 695, 65 S.Ct. 891, 89 L.Ed. 1295; Mallinckrodt v. Nunan, 8 Cir., 1945, 146 F.2d 1, certiorari denied 324 U.S. 871, 65 S.Ct. 1017, 89 L.Ed. 1426, rehearing denied 325 U.S. 892, 65 S.Ct. 1084, 89 L.Ed. 2004; Helvering v. Edison Bros. Stores, 8 Cir., 1943, 133 F.2d 575, certiorari denied 319 U.S. 752, 63 S.Ct. 1166, 87 L.Ed. 1706; United States v. Anderson, 6 Cir., 1942, 132 F.2d 98, certiorari denied 318 U.S. 790, 63 S.Ct. 994, 87 L.Ed. 1156, rehearing denied 319 U.S. 781, 63 S.Ct. 1156, 87 L.Ed. 1725. Thus it would seem that those Treasury Department rulings providing for the exclusion of patronage dividends from the gross income of cooperatives meeting certain conditions set forth in such rulings apparently relate to the provisions of Section 22(a) of the Internal Revenue Code, 26 U.S.C.A. § 22(a), which establishes a general definition of gross income for federal income tax purposes.

The exclusion of patronage dividends for federal income tax purposes is sometimes referred to as being a matter of "administrative grace" or "administrative liberality." It is believed that the use of such terminology makes for confusion, for it is obvious that no official of the Government is vested with the "grace" or "liberality" to exclude from a taxpayer's income that which is legally taxable to him under the federal income tax statutes. It would seem that the crucial question involved in determining the taxability of patronage dividends is whether they constitute income to the cooperative, or to the patrons, or to both, similar to the amounts distributed as dividends by ordinary corporations. One writer contends that it is the income of neither. See O'Meara, The Federal Income Tax in Relation to Consumer Cooperatives, 36 Illinois Law Review 60 (1941). The Commissioner of Internal Revenue and the officials of the Treasury Department in a multitude of situations must determine whether particular amounts constitute income and to whom such income is taxable for federal income tax purposes; and that is what they have to determine in the case of patronage dividends. In New Colonial Ice Company v. Helvering, 1934,

292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348, 1352, the United States Supreme Court stated, " * * * a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms." See also, White v. United States, 1938, 305 U.S. 281, 59 S.Ct. 179, 83 L. Ed. 172. As noted, there are no applicable statutes providing for the exclusion of patronage dividends for income tax purposes.

It is the view of some that provisions obligating a cooperative to pay over to its patrons all or a portion of its net receipts to be earned in the future should be regarded similarly to anticipatory assignments of income or trust agreements governing income to be earned in the future and should fall within the scope of those decisions refusing to recognize such assignments of income or trust agreements for federal income tax purposes. See Adcock, Patronage Dividends: Income Distribution or Price Adjustment, 13 Law and Contemporary Problems 505, 514, Duke University (1948). There are numerous decisions dealing with such assignments and agreements. Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655; Lucas v. Earl, 1930, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Fontana Power Co. v. Commissioner, 9 Cir., 1942, 127 F.2d 193; Saenger v. Commissioner, 5 Cir., 1934, 69 F.2d 631; Porter Royalty Pool, Inc. v. Commissioner, 1946, 7 T.C. 685; Comer v. Davis, 5 Cir., 1939, 107 F.2d 355; Balkwill v. Commissioner, 6 Cir., 1935, 77 F.2d 569, certiorari denied 1935, 296 U.S. 609, 56 S.Ct. 127, 80 L.Ed. 432. However, no case has been found in which a court determined the applicability or inapplicability of such decisions to a cooperative's distribution of patronage dividends under a pre-existing obligation. The exclusion of patronage dividends for federal income tax purposes has not been placed upon the ground that cooperatives are special creatures of statute under the tax laws, but is justified rather upon the theory that patronage dividends are in reality rebates on purchases or deferred payments on sales, allocated or distributed pursuant to a pre-existing obligation of the cooper-

214

ative, and thus do not constitute taxable income to the cooperative. Cooperative Oil Ass'n v. Commissioner, 9 Cir., 1940, 115 F.2d 666; Midland Cooperative Wholesale v. Commissioner, 1941, 44 B.T.A. 824; Treasury Department Rulings, supra.

The view is advanced by some that cooperatives take as agents or trustees only with no claim of right on their part to the patronage dividend and that the cooperative is therefore a mere conduit through which the income flows to its patrons, hence such income is excludable from its gross income for federal income tax purposes. See Jensen, The Collecting and Remitting Transactions of a Cooperative Marketing Corporation, 13 Law and Contemporary Problems 403, Duke University (1948) and cases cited in footnote 4 therein; Paul, The Justifiability of the Policy of Exempting Farmers' Marketing and Purchasing Cooperative Organizations from Federal Income Taxes, 29 Minnesota Law Review 343, 369 (1945). In the case of Saenger v. Commissioner, 5 Cir., 1934, 69 F.2d 631, 633 the United States Court of Appeals for the Fifth Circuit stated, " * * * if compensation paid to one is paid to him as the agent or servant in fact, not in fiction, of another, that income is taxable, not to the servant or agent as earner, but to its real earner, the principal (cit.)." The Court cites in support of that statement cases dealing with community property or family partnership relations. The Mississippi Supreme Court in State v. Morgan Gin Co., 1939, 186 Miss. 66, 189 So. 817, used the theory advanced in the Saenger case to uphold a cooperative's exclusion of patronage dividends from its income subject to state income tax. Though no patronage dividends were involved, the United States Supreme Court in Commissioner of Internal Revenue v. Wilcox, 1946, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, 166 A.L.R. 884, stated that in order for receipts to constitute taxable income to a taxpayer there must be (1) the presence of a claim of right to such receipts, and (2) the absence of a definite, unconditional obligation to pay the same to another. See also, North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197;

Haberkorn v. United States, 6 Cir., 1949, 173 F.2d 587. In the case of Trinidad v. Sagrada Orden de Predicadores, 1924, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458, the United States Supreme Court emphasized that in tax matters the destination rather than the source of income is the controlling factor. See also, Commissioner v. Orton, 6 Cir., 1949, 173 F.2d 483, 486.

In a very recent case, National Carbide Corp. v. Commissioner, 1949, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. ——, petitioners claimed a reduction in their income and excess profits taxes on the theory that by virtue of a contract with their controlling (Airco) corporation they were only agents of Airco to the extent of all their earnings in excess of expenses and a six percent payment on their outstanding capital stock. The United States Supreme Court denied petitioners' claims, holding that complete ownership of the subsidiary corporation and the control primarily dependent upon such ownership are no longer of significance in determining taxability. The Court went on to point out that the existence of the "agency contracts" requiring petitioners to pay all their profits above a nominal return to Airco did not conclusively determine that the income "belonged to Airco." However, the possibility that a true agency relationship might exist was not absolutely foreclosed, for the Court stated, 336 U.S. page 437, 69 S.Ct. page 734, that, "What we have said does not forclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. Whether the corporation operates in the name and for the account of the principal, binds the principal by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal (cit.) are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal du-

ties of an agent (cit.)." See also, Railway Express Agency v. Commissioner, 2 Cir., 1948, 169 F.2d 193, certiorari denied 336 U.S. 944, 69 S.Ct. 808, 93 L.Ed. ——.

It has been asserted that a cooperative cannot meet these tests of true corporate agency; that the cooperative cannot really be an agent for its patrons since when a patron makes a sale of commodities to the cooperative or a purchase of goods from it, title to such commodities or goods passes to the purchaser upon execution of the sale in both instances.

"The cooperative does not act as the true agent of any particular patron. When a patron makes a sale of commodities to the cooperative or a purchase of goods from it, title to such commodities or goods passes to the purchaser upon execution of the sale in both instances. After a marketing cooperative purchases the commodities, acquiring title thereto, it treats the commodities as its own, commingling such commodities with those of others, mixing, processing, handling, and in some cases manufacturing them without any requirement that an individual accounting be made to each patron for each particular commodity handled.

" * * * A general analysis of the business operations of cooperatives reveals the impracticability if not the impossibility of relating patronage dividends to gain or loss upon any particular transaction with any particular patron.

"To say, in effect, that a sale remains open until the end of an accounting period to permit the payment of an addition to the price does not recognize facts. For example, during 1946 there were extremely wide fluctuations in the price of flaxseed, the price increasing from $3.00 to $6.00 per bushel in just a few days. Many farmers sold flaxseed to cooperative grain elevators both before and after the price increase. In the case of a farmer who before the price increase sold flaxseed which the cooperative sold after the price increase, the theory that 'he former sale was not closed but was in fact open pending receipt of the additional price would require that an additional payment of almost $3.00 per bushel be made. The farmer who had received $6.00 initially and whose flaxseed was sold by the cooperative at $6.00 plus freight and margin would not be entitled to receive additional payment. But cooperative corporations do not return to each farmer the net proceeds of the sales of his produce less necessary expenses; instead, they determine the over-all net profits for flaxseed and these profits are shared by all flaxseed patrons in proportion to their patronage.

"The fact that cooperatives do not, by patronage dividends, adjust their prices so as to do business at cost is clearly seen in the case where transactions with a particular patron result in a loss. Assume, for example, that one patron sold only durum wheat to the cooperative, all of which was disposed of at a loss. The greater the patronage of this member, the greater is the cooperative's loss on his business, and paradoxically, the greater is his share in the cooperative's over-all net profit.

" * * * A further example will illustrate the true nature of the patronage dividend. A cooperative may maintain branches in town A and town B. Because of inefficient management or lack of sufficient volume at town B a net loss for the year may be incurred by the branch there, while a profit may be realized at the branch in town A. The patronage dividend paid to members dealing with the branch in town B represents nothing but a shifting to them of profits on transactions with an entirely different set of customers in town A. It is thus an absurdity to call the patronage dividend paid to the members in town B an adjustment to the price of produce already handled by that branch at a loss." Adcock, Patronage Dividends: Income Distribution or Price Adjustment, 13 Law and Contemporary Problems 505, 520 et seq. Duke University (1948).

Several Courts on the other hand have not regarded the formalities of purchase and sale as of determinative importance in construing the contract between a cooperative and its patrons. In Texas Certified Cottonseed Breeders' Ass'n v. Aldridge, 1933, 122 Tex. 464, pages 473–474,

61 S.W.2d 79, page 82; the Texas Supreme Court stated, "The farmers as a group form the association, and appoint it to act as their selling agent. They turn over to the association their commodities to be pooled and sold on the market to the best advantages. * * * The contract upon this point [transfer of title] is clothed in the terminology of a sale. The relation of consignor and factor has been abandoned. The logical and practical object of the members, as expressed in the contract, is to clothe the transaction in the language of a sale for the purpose of permitting the exercise of all powers named in the contract [,] rather than a consignment [,] in order to enable the association to enter bona fide transactions free from the embarrassment arising out of an incomplete title. * * * It being the clear intention of the members to create a true cooperative marketing association, under the powers enumerated by law and by the contracts, to perform certain services exclusively for its members, and to hold in the face of this intention that the delivery of the seed to the association was an absolute sale would destroy it as a cooperative marketing association." And in Rhodes v. Little Falls Dairy Co., Sup.Ct. 1930, 230 App.Div. 571, 245 N.Y.S. 432, affirmed 1931, 256 N.Y. 559, 177 N.E. 140, involving a suit by a patron against the cooperative for distribution of patronage dividends pursuant to a marketing agreement between the parties, the Court stated, 245 N.Y.S. page 434, "We do not agree with the Special Term that the contract is the ordinary one of purchase and sale. Even though title may have passed, still the arrangement is for co-operative marketing. The status of the parties partakes of a trust or fiduciary character, and is not the simple relation of vendor and vendee; the fund derived from the marketing of the product being subject to distribution among the various producers, sales of whose product had gone to make it up (cit.)." In Johnson v. Staple Cotton Co-op. Ass'n, 1926, 142 Miss. 312, 107 So. 2, it was held that the cooperative marketing contract between the association and a member created the relation of principal and agent; the association being a sales agency operating for the benefit of its members. In an extensive opinion, Bowles v. Inland Empire Dairy Ass'n, D.C.E.D. Wash.1943, 53 F.Supp. 210, the Court recognized the existence of a contract between the cooperative and its patrons by virtue of the cooperative's by-laws which provided, 53 F.Supp. page 212, footnote 1, that the patron agreed to "sell and deliver to the Association" and the Association agreed to "buy and receive such milk or cream." In spite of this plain language of purchase and sale in the by-laws, the Court held that defendant cooperative acted merely as its patrons' agent in selling their products to the ultimate consumers, and did not buy such products. Although the above cases deal only with marketing cooperatives, it could be argued that the conclusions stated would hold true for purchasing cooperatives also, in view of the general language used by Courts in construing these cooperative contracts. In addition to the cases cited, see also, California & Hawaiian Sugar Refining Corp. v. Commissioner, 9 Cir., 1947, 163 F.2d 531, certiorari denied 1948, 332 U.S. 846, 68 S.Ct. 350, 92 L.Ed. 417; Irvine Co. v. McColgan, 1945, 26 Cal.2d 160, 157 P.2d 847, 167 A.L.R. 934; Burch v. South Carolina Cotton Growers' Cooperative Ass'n, 1936, 181 S.C. 295, 187 S.E. 422; City of Owensboro v. Dark Tobacco Growers' Ass'n, 1927, 222 Ky. 164, 300 S.W. 350. But see, Central Co-operative Oil Ass'n v. Commissioner, 1935, 32 B.T.A. 359; Maryland & Virginia Milk Producers' Ass'n v. District of Columbia, 1941, 73 App.D.C. 399, 119 F.2d 787. Where under the applicable state statutes a cooperative is authorized to act both as agent and purchaser, the parties may abandon the agency relationship and expressly adopt by agreement and practice the seller-purchaser relationship in order to derive economic advantages thereby. See Clinton Co-op. Farmers Elevator Ass'n v. Farmers Union Grain Terminal Ass'n, 1947, 223 Minn. 253, 26 N.W.2d 117. Writers have also argued that the co-operating members are the real parties in interest in any transaction undertaken by the association; that

the cooperative is a legal entity and takes legal title to goods in order to adapt itself to the usages of trade and that this legal title preserves the rights of members and exists only for a special and limited purpose, i. e., for the benefit of those who deal with the association in good faith and in the normal course of business. Henderson, Cooperative Marketing Associations, 23 Columbia Law Review 91 (1923); Note, 23 Notre Dame Lawyer 342 (1948). For a consideration of the passage of title under cooperative agency and sale type contracts, see Goldsmith, Passage of Title under Cooperative Marketing Contracts, 18 Oregon Law Review 157 (1939).

Some confusion apparently exists as to whether a patronage dividend is properly termed a "deduction" or an "exclusion" from cooperative gross income. It is in fact considered by the Treasury Department as an exclusion from gross income. G.C.M. 17895, C.B. 1937–1, 56; I.T. 3208, C.B. 1938–2, 127. It is believed that the use of the term "exclusion" instead of "deduction" makes for clarity. See Bradley, Taxation of Cooperatives, Harvard Business Review 576, 577 (Autumn, 1947).

On occasion patronage dividends have been referred to generally as "rebates," with no distinction being made between those distributions to purchasing patrons of a cooperative and the distributions to patrons who market their products through a cooperative. A. Ladru Jensen, a Professor of Law at the University of Utah and a well-known writer in the field of cooperatives, in a Report on Terminology in Proceedings of the Section of Corporation, Banking and Mercantile Law of the American Bar Association in 1948, stated that the phrase "patronage dividend" originated more from historical accident than from any analogy to stock dividends of ordinary business corporations and that the usage of that phrase has contributed to misunderstanding. He recommends the use of the term "patronage payment" in the case of marketing cooperatives and the use of the term "patronage refund" in the case of a purchasing cooperative.

In the instant case neither the Iowa statute nor taxpayer's articles of incorporation make this distinction. In both instances an allocation of its earnings by a cooperative to its member patrons is referred to as a "deferred patronage dividend," whether such allocation is derived from earnings on purchases made by patrons or on sales transacted for them.

In Uniform Printing & Supply Co. v. Commissioner, 1936, 33 B.T.A. 1073, reversed 7 Cir., 1937, 88 F.2d 75, 109 A.L.R. 966; commented on in, 37 Columbia Law Review 872 (1937), and in 50 Harvard Law Review 1321 (1937), a printing corporation with stock outstanding which did business on a cost-plus basis and returned its excess earnings to its customers, who were also its stockholders, in proportion to the business they did with it, was held exempt from income tax on the amounts returned on the ground that they were refunds rather than dividends. The Court stated, 88 F.2d page 76, that:

"Had the taxpayer given a customer (whether stockholder or outsider) a discount promptly after filling the order, no one would call it a dividend. If a rebate were given promptly upon the customer's business reaching a certain volume, the same conclusion as to its character would follow. To make cost estimates and adjust them at or near the end of each year returning the excess payment to the customer should not change the reasoning which leads to this conclusion. Nor should the fact that the customer is a stockholder materially affect the result.

"Perhaps a single refund coming at the end of each year would lessen the irresistibility of the inferences, but the conclusion would still fit the facts better than one founded on a dividend assumption. It is true the taxpayer is not a nonprofit corporation in a legal sense. It is subject to a tax upon the profits by it made. Nevertheless, net profits in its case must depend upon the facts. Payment to the customers, who are also taxpayers, of sums called refunds based upon the volume of business transacted and in no way dependent upon stock ownership, is the determinative factor.

"Considering all the facts we conclude that the payments in issue were made as

refunds. rather than as dividends to stock-holding customers."

In the case of In re General Film Corp., 2 Cir., 1921, 274 F. 903, a return by the corporation to users of its film based on the amount of film used during the year was held not to be a distribution of net profits but rather a payment of rent or an expense of operation to the corporation and thus not includable in its taxable income. See also, Boulevard Theatre and Realty Corp. v. Commissioner, 1931, 23 B.T.A. 905.

Plaintiff corporation in Greene County Farmers Sales Ass'n v. United States, 1944, 102 Ct.Cl. 105, 55 F.Supp. 123, was organized and operated under by-laws which required it to return a certain part of its annual earnings to those members who did business with it, in proportion to the business transacted. However, its business was not restricted to members. The majority opinion allowed these distributions to members to be excluded from income on the ground that they were rebates to purchasers doing business with the corporation. The Court expressly stated that plaintiff was not a cooperative but rather a corporation organized for profit, and that rules relating to cooperatives were not applicable. The dissenting opinion, 55 F.Supp. page 127, pointed out that these distributions were in realty patronage dividends and only to the extent that they were paid to members on the basis of business done, in accordance with the corporation's by-laws, should they be excluded from gross income. The dissent further stated that the amounts distributed to members which were derived from business done with nonmembers could in no sense be considered rebates or discounts and should be taxed to the corporation. For other cases which do not. deal specifically with the question of the exclusion of patronage dividends from a cooperative's gross income, but which do contain related discussions see, George La Monte & Son v. Commissioner, 2 Cir., 1929, 32 F.2d 220; Valley Waste Disposal Co. v. Commissioner, 1938, 38 B.T.A. 452; Anderson-Clayton Securities Corp. v. Commissioner, 1937, 35 B.T.A. 795; Grey Bull Corp. v. Commis-sioner, 1933, 27 B.T.A. 853; Growers Cold Storage Co. v. Commissioner, 1929, 17 B.T.A. 1279; Plymouth Brewing & Malting Co. v. Commissioner, 1929, 16 B.T.A. 123. One writer has stated that patronage dividends are dependent upon the success of the enterprise and are subject to its hazards and thus should be distinguished from rebates. Bunn, Chas., Consumers' Cooperatives and Price Fixing Laws, 40 Michigan Law Review 165 (1941).

Another theory advanced for the exclusion of patronage dividends from gross income is that the cooperative is thereby taxed similarly to partnerships which make up the numerical majority of its competitors. See Rumble, Cooperatives and Income Taxes, 13 Law and Contemporary Problems 534, 543, Duke University (1948); Foley, Farmer Cooperatives, 25 Taxes 197, 204 (1947). It was stated in House Report No. 1888, supra at p. 23, that farmer cooperatives have the attributes of a partnership even though organized in corporate form.

A close analogy can be drawn between the tax positions of partnerships and true cooperatives which distribute all their net earnings to all their patrons in proportion to the business each has transacted and which qualify as tax-exempt for federal income tax purposes. In each case only one tax may be paid. The partnership is not a taxable entity, Section 181 of the Internal Revenue Code, 26 U.S.C.A. § 181, but the partner is required to include his share of partnership income in his personal return whether such income is distributed to him or not. Section 182 of the Internal Revenue Code, 26 U.S.C.A. § 182. This is the same as the obligation which the patron of the true cooperative, who makes his returns on the accrual basis, has to include patronage dividends of the cooperative which have been declared but not actually distributed, in his individual return. In a sense, therefore, both the partnership and the true cooperative are regarded as tax accounting rather than taxable entities. See Dockendorff v. United States, Ct.Cl.1949, 84 F.Supp. 372, 381. It has been stated that the treatment by Congress of partnerships for tax purposes is

unique. Haskell, Capital Contributions and "Business Purpose" in Family Partnerships, 33 Minnesota Law Review 714, 720 (1949).

As heretofore noted, there is no federal statute specifically relating to the matter of the exclusion of patronage dividends for federal income tax purposes. In the case of Helvering v. Edison Bros. Stores, 8 Cir., 1943, 133 F.2d 575, 579, the Court stated, " * * * nor can Congress, without apportionment, tax as income that which is not income within the meaning of the Sixteenth Amendment (cit.)." The theory has been advanced that if sums representing patronage dividends are not in economic realty income of the cooperative, it would be beyond the power granted Congress by the Sixteenth Amendment to tax the same as income of the cooperative. That argument was made by counsel in the case of Farmers Union Co-op. Co. of Guide Rock, Neb., v. Commissioner, 8 Cir., 1937, 90 F.2d 488, but the Court of Appeals for the Eighth Circuit did not consider it necessary to pass upon the question. It is the view of some of the members of the bar that the sweeping effect given to federal tax statutes in the more recent decisions of the United States Supreme Court and the announcement by that Court of the rule of construction to be followed in regard to such statutes have rendered it uncertain whether patronage dividends, heretofore excluded, might not be swept into the scope of the federal income tax statutes. In the case of Commissioner v. Wodehouse, June 13, 1949, 337 U.S. 369, 378, 69 S.Ct. 1120, 1124, the Court, in holding that certain income was taxable under the Revenue Act, quoted in support of its holding from another of its decisions: " 'The general object of this act is to put money into the federal treasury; and there is manifest in the reach of its many provisions an intention on the part of Congress to bring about a generous attainment of that object by imposing a tax upon pretty much every sort of income subject to the federal power.' "

In a dissenting opinion, Justice Frankfurter stated, page 404 of 337 U.S., page 1136 of 69 S.Ct., that the majority had adopted the "urgent need for revenue" rule of construction insofar as the Internal Revenue Code was concerned. In Home Furniture Co. v. Commissioner, 4 Cir., 1948, 168 F.2d 312, 313, the Court of Appeals for the Fourth Circuit stated that, "Economic realities, not legal formalities, determine tax consequences; income is taxable to its creator and controller, not to its collector (cit.)." Whatever the future may bring in respect to the taxability of patronage dividends, either by Congressional action or by decision of the United States Supreme Court, it is clear that their exclusion under certain conditions is, at present time, in accord with Treasury Department rulings and long established administrative practice.

The Treasury Department rulings or portions thereof which would seem to be pertinent to the present case are as follows:

T.D. 2737, June, 1918: "Cooperative societies which make a periodical refund—sometimes called a dividend—to members or to prospective members or to patrons generally, in proportion to the purchases made by the recipient, are not within any of the exceptions or exemptions of the Act of Sept. 8, 1916 * * * and are subject to its provisions. Where such refund payments are made in accordance with by-laws or published rules regularly adhered to, they are to be regarded as discounts or rebates, tending to reduce the taxable net income of the organization. Like discounts generally they should appear as an added item of [its] cost. This ruling is in accordance with settled practice in the administration of the income-tax laws, adopted because the real purpose of such organizations is to furnish goods at cost."

I.T. 1499, C.B. I-2 (1922) 189-191: "This office has consistently held that * * * cooperative associations, even though not exempt from taxation, may deduct from gross income for the years 1917, 1918, 1919, and 1920 the amounts returned to their patrons whether members or nonmembers, upon the basis of purchases or sales, or both, made by them * * *. In the case of purchase, instead of allowing a discount at the time of purchase, the

full price is collected, and the discount is allowed by way of rebate. In the case of sales of produce * * * the refunds * * * are in reality only part payment for the produce furnished. If the association is organized in accordance with the laws governing farmers' and other cooperative associations in the State in which it operates and if its constitution or by-laws provides for refunds or rebates to its patrons * * * upon the basis of goods purchased or produce furnished, or if it actually conducts its business upon such basis, the refunds or rebates so made, may be deducted by the association in computing net income under the Revenue Acts of 1917 and 1918. It is to be understood of course that any profits made on the business of nonmembers, which may be distributed to members in the guise of rebates are taxable to the association and the members."

I.T. 1566, C.B. II–1 (1923) 85: "A cooperative * * * which pays rebates * * * based on the purchases made during the taxable year preceding that in which the payments are actually made, and which keeps its books on an accrual basis, should take as a deduction the rebates so paid for the taxable year in which the purchases are made rather than the year in which the rebates were paid."

S.M. 2288, C.B. III–2 (1924) 233: after holding certain cooperatives not tax exempt, provides: " * * * But rebates made to patrons in proportion to their purchases may be excluded from gross income in computing the income subject to tax."

Gen. Counsel Mem. 12393, C.B. XII–2 (1933) 398: " * * * true patronage refunds are recognized by the Bureau to be discounts or rebates on purchases made in case of farmers' cooperative purchasing organizations, or part payment for produce furnished in the case of farmers' cooperative marketing organizations * * *. However, to the extent that such distributions are made from profits transacted with or for others than the distributees, they are not true patronage dividends [refunds] and are subject to the excise tax on dividends imposed by Section 213 of the National Industrial Recovery Act [48 Stat. 206]."

Gen. Counsel Mem. 17895, C.B.1937–1, 56: "So-called patronage dividends have long been recognized by the Bureau to be rebates on purchases made in case of a cooperative purchasing organization, or an additional cost of goods in case of a co-operative marketing organization, when made with respect to purchases made by, or sales made for the account of, the distributees. For purposes of administration of the Federal income tax laws, such distributions have been treated as deductions in determining the taxable net income of the distributing cooperative organization. Such distributions however, when made pursuant to a prior agreement between the cooperative organization and its patrons are more properly to be treated as exclusions from the gross income of the cooperative organization (cit). It follows, therefore, that such patronage dividends, rebates or refunds due the patrons of a cooperative organization are not profits of the cooperative organization notwithstanding the amount due such patrons can not be determined until after the closing of the books of the cooperative for a particular taxable period."

The following I. T. is generally referred to as the "Iowa ruling." It was originally issued in the form of a letter from the Commissioner of Internal Revenue to counsel for an association of Iowa cooperatives.

I. T. 3208, C.B.1938–2, 127: "Reference is made to your letter dated October 12, 1937, relative to the deduction of so-called deferred patronage dividends of cooperative corporations organized and operating under Chapter 390–G1 of the 1935 Code of Laws of the State of Iowa. You discuss the manner in which the corporations operate and request a ruling as to the deductibility of the so-called deferred patronage dividends for Federal income tax purposes.

"Under long established Bureau practice amounts payable to patrons of cooperative corporations as so-called patronage dividends have been consistently excluded from the gross income of such corporations on the ground that such amounts in reality

represent a reduction in cost to the patron of goods purchased by him through the corporation, or an additional consideration due the patron for goods sold by him through the corporation. As such amounts are not includable in gross income of the corporation, they are obviously not deductible by it, though, where they have been erroneously included in gross income in the first instance, the correcting adjustment is sometimes loosely termed a deduction. Where patronage dividends are payable only to members or stockholders (or the members receive larger patronage dividends than non-member patrons on identical transactions) the excess of the payments over the amounts due them on a patronage basis represents ordinary income to the corporation from business carried on by it for the joint profit of the members, and, consequently, distributions thereof to the members are essentially ordinary dividend payments.

"A careful study of the questions presented leads this office to the conclusion that there is a distinction between the instant patronage dividends and the payments ordinarily termed 'patronage dividends.' However, like ordinary patronage dividends those in question do not represent gross income of the corporation. If the sums you refer to as patronage dividends have been erroneously included in gross income, their elimination therefrom is by way of exclusion rather than by way of 'deduction' in the correct sense of that word as used in the revenue acts. In view of the distinction between ordinary patronage dividends and those under discussion it is believed advisable to outline the views of this office as to the status of the instant 'dividends' for income tax purposes.

"Cooperative corporations organized and operated under the above-cited Code are not authorized by the Code to make 'patronage dividend payments' within the usual comprehension of that term. The Code by section 8512-g30 [I.C.A. § 499.30] provides that corporate earnings in excess of operating expenses (which include specified reserves, stated additions to surplus, permitted additions to an educational fund and payment of fixed dividends on stock or memberships) shall be allocated to a revolving fund and shall be credited to the account of members in proportion to the business done with the association during the year. Such credits which are referred to as 'deferred patronage dividends' must be applied against unpaid or stock membership subscriptions, if any.

"The directors are permitted by section 8512-g33 [I.C.A. § 499.33] to use the revolving fund to pay debts or add to the capital of the association or retire its preferred stock. If so used, the deferred patronage dividend credits constitute a charge on the fund and on the corporate assets, subordinate to creditors and preferred stockholders then or thereafter existing. The cited section also provides that deferred patronage dividends for any year shall have priority over those for any subsequent year.

"Section 8512-g34 [I.C.A. § 499.34] provides that the association may issue transferable or nontransferable certificates for deferred patronage dividends.

"Section 8512-g35 [I.C.A. § 499.35] provides that such dividend credits or certificates issued therefor shall not mature until the dissolution or liquidation of the association but shall be callable by it in the order of their issuance.

"Section 8512-g48 [I.C.A. § 499.48] provides that on dissolution or liquidation, the association shall first pay liquidation expenses, then its obligations other than patronage dividends and the remaining assets shall be distributed in the following order (1) to preferred stockholders to the extent of their capital plus accrued dividends; (2) to holders of deferred patronage dividend credits or certificates issued therefor; (3) to members or common stockholders to the extent of their capital plus accrued dividends; and (4) the remaining assets to members in proportion to their deferred patronage dividend credits.

"A sample Participation Certificate issued by one of the corporations in question purports to certify that it has an established revolving fund credit on its books in the amount stated to the person named. It is stated thereon that such credits are non-interest bearing and payable at dissolution

but the association reserves the right to retire the certificate in whole or in part at any time. Such certificate further states that it represents capital contributed to the revolving fund from patronage dividends, and that all money, property and assets representing revolving fund credits need not be segregated or allocated and this certificate shall remain subject and inferior to the rights and claims of all creditors, common, secured or preferred.

"It seems manifest under the terms of the Code in question that the amounts credited to the members as 'deferred patronage dividends' represent contributions to the working capital of the corporation involved rather than an indebtedness of such corporation. The members thus credited are entitled to receive the amount of such credit only at retirement, upon call by the corporation prior to liquidation, or upon liquidation if the assets of the corporation are sufficient to pay off such credits after paying off prior claims. Such credits do not mature during the life of the organization, they do not bear interest and are made subordinate to the claims of preferred stockholders. The holders of such credits divide accumulated earnings of the corporation after payment of preferred and common stock plus accrued dividends thereon. The holders are thus made a third class of shareholder in the corporation. As the status of a shareholder in a corporation is not dependent upon the actual issuance of stock, the stated conclusion does not depend upon the issuance of participation certificates evidencing the credits in question.

"Accordingly, in the opinion of this office patrons of the corporations in question are required by the terms of the Code to take stock of the corporation in lieu of the usual patronage dividends. As such credits represent contributions for capital stock, the amount thereof is not income to the corporation but the value thereof is income to the patrons credited. That is, a patron member of the instant corporations agrees to buy or sell through the corporations with the understanding that in addition to the fixed consideration passing at the time of the transaction, his proportion-

ate share of the proceeds of the corporation over its statutory operating expenses shall be credited to his capital account with the corporation.

"The above conclusion holds true only to the extent that the credits involved represent earnings or receipts in excess of operating expenses on transactions with patron members. Apparently under section 8512-g3 of the Code the corporations may deal with nonmembers, but patronage dividend credits may be made only to members. Accordingly, to the extent such credits represent earnings or receipts in excess of operating expenses on transactions with nonmembers, the amount thereof is ordinary income to the corporation and the credits therefor to members should be treated as the issuance of stock dividends to members."

It is interesting to note the development through the years of these various administrative rulings of the Treasury Department. Treasury Decision 2737, supra, issued in 1918 and providing for the exclusion of patronage dividends made by purchasing cooperatives to their patrons, did not base such exclusion upon any statutory provision of the Internal Revenue Code or upon any Treasury Regulation. I. T. 1499, supra, issued in 1922, referred to T. D. 2737, and to Article 522, Regulations 45 promulgated under Section 231 of the Revenue Act of 1918, as allowing exclusions from taxable income of patronage dividends or refunds made by those cooperatives acting as purchasing agents for their patrons. However, I. T. 1499 extended this exclusion privilege to marketing cooperatives and also stated that the exclusion could be availed of by a cooperative which distributed patronage dividends or refunds pursuant to a provision in its constitution or by-laws, *or if it actually conducted its business upon such basis.* (Emphasis added.) I. T. 1499 contains a statement limiting its applicability to cooperative gross income for the years 1917 to 1920 inclusive. Subsequent Treasury Department rulings contain no references to Treasury Regulations but seem rather to base the exclusion of patronage dividends upon these various administrative rulings of the Treas-

ury Department. See G. C. M. 12393 and 17895, and I . T. 3208, set out above.

■ In addition it should be noted that these later regulations contain no provision for the exclusion of distributions to patrons made by a cooperative which "actually conducts its business upon such basis," but rather seem to require a prior agreement or pre-existing obligation on the part of the cooperative to make such allocation or distribution. Thus it seems clear that an exclusion will be allowed only to the extent the cooperative is under a pre-existing obligation to allocate or distribute a portion or all of its earnings to its patrons in accord with the amount of business each has transacted during the year.

■ That statutes, articles of incorporation or by-laws of a corporation may create a contractual obligation between the corporation and its members or stockholders has been recognized in Iowa as well as other jurisdictions. O'Connor v. Home Savings & Loan Ass'n, 1938, 224 Iowa 1127, 278 N.W. 636; Wabash Ry. Co. v. Barclay, 1930, 280 U.S. 197, 202, 50 S.Ct. 106, 74 L.Ed. 368, 67 A.L.R. 762; Crocker v. Waltham Watch Co., 1944, 315 Mass. 397, 53 N.E.2d 230.

The Court in American Box Shook Export Ass'n v. Commissioner, 1945, 4 T.C. 758, affirmed 9 Cir., 1946, 156 F.2d 629, held that all the petitioner's income was taxable to it as its own since it was formed under the general corporation laws of California and neither the statute, its articles of incorporation, nor its by-laws required patronage dividends. There was evidence of an "informal understanding" to that effect between petitioner and its stockholders, but the Court concluded that this was not a legally binding obligation requiring the petitioner to repay to its stockholders all income after deducting expenses and a reserve for future claims.

A claim that distribution of earnings to its stockholders on the basis of their business with the petitioner was a patronage dividend and should be allowed as a deduction (exclusion) from its gross income was disallowed by the Court in Peoples Gin Co. v. Commissioner, 1940, 41 B.T.A. 343, af-firmed 5 Cir., 1941, 118 F.2d 72. The by-laws providing for the distribution had been adopted near the end of petitioner's fiscal year, just prior to the distribution and the Court in denying any exclusion based its conclusion upon the fact that, 118 F.2d page 73, "When this income was received by the corporation there was no obligation to make refunds or rebates to stockholders." The Commissioner of Internal Revenue again attempted to tax the company's patronage dividends at the corporate level in a subsequent year, but on this occasion the Tax Court recognized that the by-laws which had been adopted in a previous year obligated the company to make the payments involved and decided that it was therefore entitled to deduct such payments from its gross income. Peoples Gin Co. v. Commissioner, 1943, 2 T.C.M. 325.

The directors of petitioner in Fountain City Co-op. Creamery Ass'n v. Commissioner, 1947, 9 T.C. 1077, affirmed 7 Cir., 1949, 172 F.2d 666, had the discretion under a Wisconsin statute to apportion the net proceeds of the business at least once annually, but since they had apparently retained a large portion of the proceeds in prior years for other purposes than required surplus, the Court determined that a "Patrons' Equity Reserve," which allegedly contained sums belonging to patrons, was in reality the property of the cooperative and taxable to it. Again the basis for the disallowance of any exclusion seemed to be the Court's failure to find a positive obligation on the part of the cooperative to pay this reserve to its patrons, for the Court stated, 172 F.2d page 667, "What part, if any, should go to the patrons rested in the discretion of the board of directors or a majority of the stockholders (cit.)." Thus the Court determined that until there was a more positive appropriation for the patrons than a mere credit to a "Patrons' Equity Reserve" the sum belonged and was taxable to the cooperative. It is interesting to note that petitioner in that case was organized in 1900 under a Wisconsin statute providing for cooperative corporations. However, it had neither allocated nor paid any patronage dividends up to the time in 1943 when it credited

the "Patrons' Equity Reserve" account referred to above, which gave rise to this action. The Tax Court held that petitioner never qualified as a cooperative organization under the Wisconsin statute. The Tax Court further pointed, 9 T.C. page 1081, to the wide discretionary powers vested in petitioner's directors in the disposal of the association's income. The declaration of a patronage dividend was thus held to be entirely within the discretion of the directors, and any obligation to allocate or distribute patronage dividends was thus negatived in the Tax Court's opinion.

A seemingly opposite result was reached in Midland Cooperative Wholesale v. Commissioner, 1941, 44 B.T.A. 824, where the Board of Tax Appeals held that a credit to a "Patrons' Equity Reserve" account was correctly excluded by the cooperative from its gross income. The by-laws of the Midland Cooperative had provided that all the net earnings after certain deductions for expenses, surplus, an educational fund and dividends on capital stock should go to the patrons. The Board recognized the liberality of the Treasury Department in allowing exclusions of patronage dividends from the gross income of cooperatives and further recognized the existence of a legal obligation on the part of the cooperative to its patrons by virtue of its by-laws, so that no further corporate action was required, other than this credit to a "Patrons' Equity Reserve," in order to appropriate these amounts to the patrons. Thus the Fountain City and the Midland cases could be distinguished on the basis of the presence of a pre-existing obligation in the Midlands case and the absence of one in the Fountain City case. The courts have seemed much in accord in construing wide discretionary powers in the directors as negativing the existence of any contractual obligation on the part of the cooperative toward its patrons, and in such cases as the latter have denied exclusions even for patronage dividends actually distributed.

In Associated Grocers of Ala. v. Willingham, D.C.N.D.Ala.1948, 77 F.Supp. 990, an amendment to the corporation's by-laws made mandatory the distribution of patron-age dividend certificates, but a subsequent amendment to its articles of incorporation just a week later provided that the directors could declare patronage dividends or not, in their discretion. In denying the corporation's claim for exclusion of patronage dividends actually distributed the Court held the latter amendment was controlling and since the discretion vested in the directors by virtue of such amendment negatived any pre-existing obligation on the part of the corporation toward its patrons, the distributions were treated similarly to ordinary dividend payments of a business corporation.

Petitioner in Co-operative Oil Ass'n v. Commissioner, 9 Cir., 1940, 115 F.2d 666, claimed a deduction (exclusion) for the entire amount of its earnings though only a portion had been distributed to its patrons. The Court allowed an exclusion for those sums actually paid out and in denying an exclusion for the sums retained by the cooperative pointed out, 115 F.2d page 668, that no statute allowed such exclusion and the administrative practice had been to permit cooperative associations to exclude from gross income only those amounts actually paid out as patronage dividends. Though there was no reference in the opinion to any contractual obligation on the part of the cooperative to its members as regards the undistributed earnings, it is apparent from the by-laws and membership agreements that, to the extent of such earnings, no obligation existed. The by-laws provided, 115 F.2d page 667, that, "Before distribution of patronage dividends herein provided for it shall be the duty of the board of directors, and they shall have the right to retain and accumulate out of the net earnings of the corporation such amounts as, in the judgment of said board of directors are necessary and proper to create a reserve or reserve funds necessary to provide working capital and the proper facilities for carrying on the business of the corporation." Similar provisions were embodied in the membership agreements.

In Fruit Growers' Supply Co. v. Commissioner, 1930, 21 B.T.A. 315, affirmed 9 Cir., 1932, 56 F.2d 90, petitioner contended that

it was entitled to exclusions from gross income for sums which were undistributed and unallocated but which it claimed it was obligated by its charter to return to members on the basis of business transacted. The by-laws provided, 56 F.2d page 93, that it should be the duty of the directors to, " * * * 'declare dividends out of surplus profits when such profits shall, in the opinion of the directors, warrant the same, * * *.' " Another section authorized the directors to prescribe the time and manner of readjustment with or refund to its patrons. The conclusion of the Board of Tax Appeals below, 21 B.T.A. page 326, that, "A reasonable interpretation of the foregoing would seem to be that corporate action is required before patronage dividends accrue, * * *" was upheld by the Court of Appeals for the 9th Circuit, which affirmed the Board in denying petitioner's claim. A major factor in the Court's decision was the absence of an obligation arising by virtue of statute, by-laws, etc., which would cause the patronage dividends to accrue without corporate action setting them apart as a liability of the corporation to its members.

In Midland Cooperative Wholesale v. Ickes, 8 Cir., 1942, 125 F.2d 618, certiorari denied 316 U.S. 673, 62 S.Ct. 1045, 86 L. Ed. 1748, rehearing denied 316 U.S. 712, 62 S.Ct. 1289, 86 L.Ed. 1777, and 317 U.S. 706, 63 S.Ct. 67, 87 L.Ed. 563, the Court stated that petitioner, a nonprofit wholesale cooperative, was obligated by the Minnesota laws and its own by-laws to distribute patronage dividends, but since it could not qualify as a true (or as the Court termed it, "bona fide and legitimate") farmers' cooperative, it could not purchase coal for resale at a discount to its cooperative members within the terms of the Bituminous Coal Act of 1937, cited infra. The Court went on to discuss the nature of patronage dividends and on page 635 of 125 F.2d stated, "The patronage dividend is as much a part of the transaction as the price itself." Thus the Court supported the position that statutes and by-laws or other agreements may create a contractual liability on the part of a corporation toward its patrons which cannot be repudiated by the corporation. This obligation is also binding on the patron. Rusconi v. California Fruit Exchange, 1929, 100 Cal.App. 750, 281 P. 84.

The petitioner in Clay Sewer Pipe Ass'n v. Commissioner, 1 T.C. 529, affirmed 3 Cir., 1943, 139 F.2d 130, claimed a deduction for a certain reserve fund it had established on the theory that it had received that money from its members as a prepayment for services and was under an obligation to use the money only in the manner provided in contracts with its subscribers. But the Court could not find that the terms of these "contracts" had been incorporated in the formal articles of agreement or elsewhere and denied the deduction. The Court went on to state, 139 F.2d page 133, " * * * the ordinary restrictions upon corporate activity due to the charter powers of the corporation, * * * are not tantamount to restrictions which will render monies received non-taxable for income tax purposes (cit.)."

In Farmers Union Co-op. Co. of Guide Rock, Neb., v. Commissioner, 8 Cir., 1937, 90 F.2d 488, the cooperative contended that the balance of its earnings above actual costs was "accumulated patrons' savings" and as such was not the property of the cooperative and never was. It was claimed that by virtue of an obligation created by state statute and its own by-laws this balance was held by the cooperative as a bailee for its patrons and that it must be returned when the cooperative transaction was completed unless used for a legal purpose. The United States Court of Appeals for the Eighth Circuit rejected this argument however, pointing out, 90 F.2d page 491, that the cooperative was a separate legal entity —a corporation—and that according to the state statute and its by-laws it could use these earnings for dividends on its stock and for other purposes before distributing them as patronage dividends, thus such earnings belonged to the cooperative just as much as did the property it owned. The interest of those entitled to patronage dividends was likened to that of ordinary stockholders of a corporation with some declaration by the corporation being necessary to give such persons ownership in the

earnings. The Nebraska statute defined a "cooperative company", 90 F.2d page 489, as being one, " 'which authorizes the distribution of its earnings *in part*, or wholly, on the basis of, or in proportion to the amount of property bought from or sold to members, or of labor performed, or other service rendered to the corporation.' " The by-laws of the corporation provided, 90 F.2d page 490, that the directors should, " * * * set aside from time to time such sums from the net profits as in their judgment they shall deem desirable for a surplus." The decisive factor in the case seemed to be the fact that the receipts of the cooperative could be used for stock dividends and other purposes and only needed to be distributed *in part* as patronage dividends. (Emphasis added.) The discretion in the disposal of the cooperative's earnings vested in the directors thus negatived any pre-existing obligation on the part of the cooperative to distribute its earnings to its patrons. Cf. Penn. Mutual Life Ins. Co. v. Lederer, 1920, 252 U.S. 523, 40 S.Ct. 397, 64 L.Ed. 698.

In a number of cases the Tax Court has recognized that a "liability" may exist by virtue of state statutes, articles of incorporation, by-laws, or other agreements, on the part of the cooperative to its patrons for that amount of its net earnings over which the directors have no discretionary powers of appropriation. Exclusion of such amounts from the gross income of the cooperative organizations concerned has been consistently allowed on the theory that this "liability" is a contractual obligation on the part of the cooperative to its members and the declaration or payment of the patronage dividends is a mere recognition of this obligation. In United Cooperatives, Inc., v. Commissioner, 1944, 4 T.C. 93, the by-laws of petitioner provided that all net income other than certain reserves and an 8 percent stock dividend (in the directors' discretion) should be distributed to patrons. The Tax Court allowed an exclusion for that amount of the net earnings remaining after deduction of those sums which the directors were either obligated or had the discretion to distribute. In holding that a legal obligation existed only to the extent of those amounts over which the directors had no discretion the Court stated, 4 T.C. page 106, "However, this practice of excluding patronage dividends from gross income has been limited to those cases in which the right of patrons to such dividends arises by reason of the corporation charter, or bylaws, or some other contract, and does not depend upon some corporate action taken subsequent to its receipt of the money later so distributed, such as the action of the corporation's officers or directors." See also, Midland Cooperative Wholesale v. Commissioner, supra; Valparaiso Grain & Lumber Co. v. Commissioner, 1941, 44 B.T.A. 125; Farmers' Union Co-operative Ass'n v. Commissioner, 1928, 13 B.T.A. 969; Anamosa Farmers Creamery Co. v. Commissioner, 1928, 13 B.T.A. 907; Home Builders Shipping Ass'n v. Commissioner, 1927, 8 B.T.A. 903; Western Colo. Producers Cooperative v. Commissioner, 1943, T.C.M., P.H. par. 43,107; Farmers Union Coop. Exchange v. Commissioner (1944) T.C.M., P.H. par. 44,384. To the same effect see Hulbert, Legal Phases of Cooperative Association, 1942, at p. 266 and House Report No. 1888, supra, at p. 16.

In Farmers Union State Exchange v. Commissioner, 1934, 30 B.T.A. 1051, no by-laws were put in evidence and the Board of Tax Appeals held that petitioner's articles of incorporation providing for the distribution of earnings in whole or in part to members on the basis of business done was not sufficient to create a definite liability each year, and on that ground exclusions for undeclared and unpaid patronage dividends were denied.

Directors of defendant cooperative were allowed to declare a patronage dividend and then rescind their action in Callaway v. Farmers' Union Co-op. Ass'n of Fairbury, 1929, 119 Neb. 1, 226 N.W. 802. The Court upheld their action stating that the by-laws of the cooperative made the disposal of earnings discretionary with the directors and that the by-laws must be enforced as a contract between the cooperative and its members.

A strong case supporting the theory that where an obligation to distribute net earn-

ings to patrons exists the cooperative does not own its net proceeds but only holds them as agent or trustee for its members is San Joaquin Valley Poultry Producers' Ass'n v. Commissioner, 9 Cir., 1943, 136 F.2d 382. Petitioner was organized as a nonprofit cooperative association incorporated under the Agricultural Code of California. Its by-laws provided, 136 F.2d page 384, footnote 11, that, " 'The "net proceeds" shall be such funds as are derived from overcharges on sales and as are left after all expenses shall have been paid, or provided for, all at the discretion of the directors. The "net proceeds" resulting from the operation of the business, if any, shall belong to the members * * * and shall be prorated to them in proportion to the amount of business each member has transacted with (petitioner) * * *.' " The directors had established three reserve funds with part of the net proceeds of the business and in holding that these reserve funds were not the property of the petitioner and thus were excludable from its gross income the Court stated, 136 F.2d page 385, that, "The sums so placed in these reserves * * * never became the property of petitioner, but were and are the property of the members (cit.). * * * The fact that the sums were not payable to the members on demand, or at any fixed time, does not alter the fact that they were their property and not petitioner's. Petitioner held them, not as owner, but as agent or trustee for the members (cit.). Since none of the sums ever belonged to petitioner, they could not be, and were not, income of petitioner."

Although it has been stated that any organization which would render services at cost can receive the same tax exclusion privileges accorded cooperatives, House Report No. 1888, supra at p. 40; Note, 32 Minnesota Law Review 785, 789 (1948), the Board of Tax Appeals in at least one case refused to grant an exclusion to a non-cooperative corporation which handled farm products and contracted to distribute all its net profits to contract holders on the basis of business transacted with the corporation. Juneau Dairies, Inc., v. Commissioner, 1941, 44 B.T.A. 759. See also, Flagg, Associations Taxable as Corpora-

tions, 13 Tax Magazine 589 (1935); Taxability of Unincorporated Corporate Equivalent, 92 University of Pennsylvania Law Review 296 (1944). But see, Uniform Printing & Supply Co. v. Commissioner, 7 Cir., 1937, 88 F.2d 75, 109 A.L.R. 966. Other organizations similar to cooperatives have been granted tax exemption under Section 101 of the Internal Revenue Code, 26 U.S.C.A. § 101. See also, Palmer, Income Tax Exemption of State Savings & Loan Association, 6 John Marshall Law Quarterly 271 (1940).

The so-called "command of income" theory enunciated in recent United States Supreme Court decisions could have some relation to the obligation which, under the Treasury rulings, must exist prior to the allocation or distribution of a patronage dividend by a cooperative organization in order for the cooperative to exclude such amounts from its gross income. In the case of Commissioner of Internal Revenue v. Tower, 1946, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135; the United States Supreme Court stated, page 290 of 327 U.S., page 537 of 66 S.Ct., "It is the command of the taxpayer over the income which is the concern of the tax laws. Harrison v. Schaffner, 312 U.S. 579, 581, 582, 61 S.Ct. 759, 761, 85 L.Ed. 1055. And income earned by one person is taxable as his, if given to another for the donor's satisfaction. Helvering v. Horst, 311 U.S. 112, 119, 61 S.Ct. 144, 148, 85 L.Ed. 75, 131 A.L.R. 655." See also, Commissioner v. Culbertson, 1949, 337 U.S. 733, 69 S.Ct. 1210; Lusthaus v. Commissioner, 1946, 327 U.S. 293, 66 S.Ct. 539, 90 L.Ed. 679; Corliss v. Bowers, 1930, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, and Helvering v. Gordon, 8 Cir., 1937, 87 F.2d 663. If an organization at the time the income was received by it was under no obligation to allocate or distribute it as a patronage dividend but later did so, it could be claimed that in so doing it was distributing the income by virtue of its command over such income and was in effect the donor of the income. In the case of Associated Grocers of Ala. v. Willingham, D.C.N.D.Ala.1948, 77 F.Supp. 990, pe-

titioner claimed certain patronage dividends paid by it should be excluded from its gross income for federal income tax purposes. The Court, in denying petitioner's claim, stated, 77 F.Supp. page 992, that, "For the plaintiff to recover, it must be established that there was an obligation by the corporation to make refunds or rebates to member patrons when the incomes for the respective years were received by the corporation. Peoples' Gin Co., Inc., v. Commissioner of Internal Revenue, 5 Cir., 118 F.2d 72." The Court of Appeals for the Seventh Circuit has held that where a cooperative credited a portion of its earnings to a "Patrons' Equity Reserve" and issued certificates to its patrons, since that reserve against which the certificates were issued was still apparently subject to the command or control of the cooperative, the latter could claim no exclusion for such reserve. Fountain City Co-op. Creamery Ass'n v. Commissioner, 7 Cir., 1949, 172 F.2d 666.

■ The question of the validity of the obligation for federal income tax purposes could be of importance in this regard also. The mere creation of an obligation to distribute one's income to another does not usually relieve the obligor of tax liability. See Lucas v. Earl, 1930, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Shelley et al. v. Commissioner, 1943, 2 T.C. 62, and other cases having to do with anticipatory assignments of income and trust agreements covering income to be earned in the future, cited supra. If the self-imposed obligation of a cooperative to distribute its earnings as a patronage dividend is regarded as being a valid one and as not falling within the scope of those decisions negativing the efficacy for federal income tax purposes of anticipatory assignments of income, then by virtue of such obligation the cooperative no longer commands the income so obligated. However, if a cooperative distributes its earnings as a patronage dividend without any previous obligation to do so, it could be claimed that in making such distribution the taxpayer was exercising its own command over the income and was in effect acting as donor of the same.

Notwithstanding the importance attached to the matter of a pre-existing obligation, it would seem that it does not constitute the sole matter for consideration in determining the excludability of patronage dividends for federal income tax purposes, although it is one of the matters to be considered in determining the economic realities of the situation. Neither the Treasury Department nor the courts have based the excludability of patronage dividends for federal income tax purposes of those cooperatives not fulfilling the statutory requirements for exemption upon any enactment of Congress. Therefore, it would seem that Treasury Department rulings excluding patronage dividends for federal income tax purposes must be based, as they apparently are, upon the theory that under certain conditions a part or all of the earnings of a cooperative are in economic reality not the income of the cooperative but the income of its patrons. It would seem that to put it upon any other basis would in effect be to say that Congress by silent reflection upon those Treasury rulings had thereby spread upon the statute books provision for the exclusion of patronage dividends.

It should be noted that the matter of a cooperative exemption from federal income tax is dealt with by statute and by Treasury Regulations, whereas the matter of the exclusion of patronage dividends from a cooperative's gross income is provided for by administrative rulings of the Treasury Department in the form of T.D.'s, I.T.'s, S.M.'s, G.C.M.'s and letters from Treasury Department officials.

■ It appears well settled that Treasury Regulations may have the force and effect of statute, and must be sustained unless unreasonable or plainly inconsistent with revenue statutes. Commissioner of Internal Revenue v. South Texas Lumber Co., 1948, 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831; rehearing denied 334 U.S. 813, 68 S.Ct. 1014, 92 L.Ed. 1744; Boehm v. Commissioner, 1945, 326 U.S. 287, 291, 292, 66 S.Ct. 120, 90 L.Ed. 78, 166 A.L.R. 708; rehearing denied 326 U.S. 811, 66 S.Ct. 468, 90 L.Ed. 495; Helvering v R. J.

Reynolds Co., 1939, 306 U.S. 110, 115, 59 S.Ct. 423, 83 L.Ed. 536.

Treasury Department and Bureau of Internal Revenue rulings on the other hand are not entitled to as great weight or consideration as are Treasury Department Regulations. Bartels v. Birmingham, 1947, 332 U.S. 126, 132, 67 S.Ct. 1547, 91 L.Ed. 1947, 172 A.L.R. 317; Higgins v. Commissioner, 1941, 312 U.S. 212, 215, 61 S.Ct. 475, 85 L.Ed. 783; Helvering v. New York Trust Co., 1934, 292 U.S. 455, 468, 54 S.Ct. 806, 78 L.Ed. 1361; Aluminum Co. of America v. United States, 3 Cir., 1941, 123 F.2d 615, 621; Van Antwerp v. United States, 9 Cir., 1937, 92 F.2d 871, 875.

However, although not binding on the courts, administrative rulings and administrative practices of the Treasury Department, consistent and generally unchallenged, are entitled to high respect and should not be overturned except for very cogent reasons. Citizens Nat. Trust and Savings Bank of Los Angeles v. United States, 9 Cir., 1943, 135 F.2d 527, 529; Biddle v. Commissioner, 2 Cir., 1936, 86 F.2d 718, 721, affirmed 302 U.S. 573, 58 S.Ct. 379, 82 L.Ed. 431; United States v. Maryland Casualty Co., 7 Cir., 1931, 49 F.2d 556, 558; Continental Assurance Co. v. United States, 1934, 8 F.Supp. 474, 483, 79 Ct.Cl. 756. See also, Norwegian Nitrogen Products Co. v. United States, 1933, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796; United States v. Missouri P. R. Co., 1929, 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322; Minnesota Tea Co. v. Commissioner, 8 Cir., 1935, 76 F.2d 797, 800, 801, affirmed Minnesota Tea Co. v. Helvering, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Bowring v. Bowers, 2 Cir., 1928, 24 F.2d 918, 923.

This Court is not prepared to hold that long established Treasury rulings to the effect that under certain specified conditions earnings of a cooperative which are excluded as patronage dividends are in economic reality the income of the patrons and not of the cooperative are so unreasonable or erroneous as to be disregarded. Economic realities in general are to be arrived at from a consideration and examination of the total factual situation.

The United States Supreme Court in Commissioner of Internal Revenue v. Culbertson, 1949, 337 U.S. 733, 69 S.Ct. 1210, stressed the fact that economic realities are of great importance in the solution of tax problems. To the same effect see, Home Furniture Co. v. Commissioner, 4 Cir., 1948, 168 F.2d 312, 313. For the test of economic realities for Social Security Tax purposes, see United States v. Silk, 1947, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757.

The recission or revocation of the Treasury Department rulings in question would not of necessity be determinative on the question of the exclusion of patronage dividends for federal income tax purposes. Even without such rulings a cooperative could still litigate the question whether the amount it had allocated or distributed as a patronage dividend was or was not in economic reality the income of the cooperative.

Although Congress has never made provision for the exclusion of patronage dividends from a cooperative's gross income, apart from patronage dividends that body has included specific provisions relating to cooperatives in many of its enactments over a period of years. Rural cooperatives have been excluded from the operation of anti-trust laws, Section 1 of the Capper-Volstead Act (1922) 42 Stat. 388, 7 U.S.C.A. § 291; Section 6 of the Clayton Act (1914) 38 Stat. 730, 15 U.S.C.A. § 12, 38 Stat. 731, 15 U.S.C.A. § 17; Tigner v. State of Texas, supra; United States v. Rock Royal Cooperative, 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (state court cases collected); United States v. Dairy Co-op. Ass'n, D.C. Or.1943, 49 F.Supp. 475, and have been the objects of specific provisions in other legislative acts. Agricultural Credit Act of 1913, 42 Stat. 1479, 12 U.S.C.A. § 351; Grain Futures Act of 1922, 42 Stat. 1001, 7 U.S.C.A. § 6a, upheld in Board of Trade of City of Chicago v. Olsen, 1923, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839, and as amended by Commodities Exchange Act (1936) 49 Stat. 1499, 7 U.S.C.A. § 10a; the Cooperative Marketing Act (1926) 44 Stat. 802, 7 U.S.C.A. § 451 (establishing a cooperative division in the Department of

Agriculture); Section 3(a)(5) of the Securities Act of 1933, 48 Stat. 74, 76, 15 U.S.C.A. § 77c(a)(5); the N.I.R.A. 48 Stat. 195 (see in conjunction with Exec. Order No. 6355, Oct. 23, 1933); the Agricultural Marketing Act of 1929, as amended by the Farm Credit Act of 1933, creating a central and twelve regional Banks for Cooperatives, 48 Stat. 257, 49 Stat. 317, 12 U.S.C.A. §§ 1134 et seq., 1141 et seq.; Section 203(b) of the Motor Carrier Act of 1935, 49 Stat. 545, 49 U.S.C.A. § 303(b); the Rural Electrification Act of 1936, 49 Stat. 1365, 7 U.S.C.A. § 904; Section 4, II(i) of the Bituminous Coal Act of 1937, 50 Stat. 81, 15 U.S.C.A. § 833i (expired 1943, 57 Stat. 84); the Agricultural Adjustment Act of 1938, 52 Stat. 31, 7 U.S.C.A. § 1281. Section 4 of The Robinson-Patman Act (1936) 49 Stat. 1528, 15 U.S.C.A. § 13b, refers to cooperatives generally in excluding distributions of net earnings or surplus by such organizations from the other provisions of that Act which prohibited any rebates which had the effect of lessening competition or creating a monopoly. See Quality Bakers of America v. Federal Trade Commission, 1 Cir., 1940, 114 F.2d 393. See also, 36 Opinions of Attorneys General 326, 332–336 (August 11th, 1930).

Under the Treasury Department rulings referred to and set out above, a number of conditions must be met before that Department will regard the amount allocated or distributed by a cooperative as a patronage dividend excludable from the cooperative's gross income.

So far as pertinent to the present case those conditions are:

1. That the cooperative must have been under a pre-existing obligation to allocate a patronage dividend in the amount that was allocated or distributed.

2. That the patronage dividend allocated to member patrons shall not include profits realized from transactions with non-members.

It is the claim of the defendant Collector that at the time the patronage dividend in question was declared the taxpayer was under no pre-existing legal obligation to allocate its earnings to its member patrons. The Collector contends that the obligation to allocate the dividend in question arose only upon the passage of a motion to that effect by taxpayer's board of directors on November 3d, 1944, three days after the expiration of taxpayer's fiscal year on October 31st, 1944. The exclusion of the patronage dividend in question is claimed by the taxpayer for its fiscal year ending October 31st, 1944. A portion of the argument in the present case was devoted to what the legal situation would have been if taxpayer's board of directors had in fact met on the evening of October 31st, 1944, and declared the patronage dividend in question. It was stated in the argument in behalf of the taxpayer that it is current and prudent business practice to have a yearly audit of the books and records of a cooperative and that manifestly such audit could not be made in the present case until after the end of the fiscal year on October 31st, 1944. Taxpayer contended that until such audit was made it would not be prudent business practice to fix the amount of the patronage dividend. It was further stated in argument that in some cases the board of directors of a cooperative meet just before the end of the fiscal year and adopt a general resolution relating to the declaration of a patronage dividend, leaving the exact amount to be determined following the yearly audit, upon the apparent theory that such action would have the same force and effect as a pre-existing obligation so far as the exclusion of patronage dividends from gross income was concerned. I. T. 1499, C.B. I–2 (1922) 189, noted above, provided that both marketing and purchasing cooperatives could exclude from their taxable income those amounts distributed as patronage dividends to their patrons when such distribution was made either pursuant to provisions in the cooperative's constitution or by-laws, or if the cooperative customarily followed the practice of distributing patronage dividends to its patrons. However, subsequent Treasury Department rulings did not contain any provision for the exclusion of patronage dividends from a cooperative's taxable income merely because the cooperative reg-

ularly made such distributions, but seemed rather to require a pre-existing obligation on the part of the cooperative to allocate or distribute a portion or all of its earnings as patronage dividends before the cooperative could exclude such sums from its gross income. If a cooperative were under no pre-existing obligation to distribute or allocate any part of its earnings as a patronage dividend, but did just prior to the end of a particular fiscal year allocate its earnings for that year as a patronage dividend, it could be claimed that in so doing it was exercising its own command over its income and that it was in fact the donor of the amount involved and should be taxed thereon. See Peoples Gin Co. v. Commissioner, 5 Cir., 1941, 118 F.2d 72, and Peoples Gin Co. v. Commissioner, 1943, 2 T.C.M. 325. However, since the taxpayer in the present case did not declare the dividend in question until after the end of its fiscal year, the crucial question here was whether, under the applicable Iowa statutes and taxpayer's articles of incorporation, it was obligated to allocate the patronage dividend in question to its member patrons. Under the Treasury Department rulings and the decisions in accord therewith, the taxpayer could only exclude such a dividend from its gross income for the fiscal year in question if it was obligated to make such an allocation in the absence of corporate action on its part. Treasury Department ruling, supra; Cooperative Oil Ass'n v. Commissioner, 9 Cir., 1940, 115 F.2d 666; Midland Cooperative Wholesale v. Commissioner, 1941, 44 B.T.A. 824. In the present case such obligation would have to arise out of the state statutes under which taxpayer was organized or out of its own articles of incorporation, as no coroprate bylaws or special contracts with the members were introduced in evidence.

The Chapter of the Iowa Code under which the taxpayer is organized contains the following provisions:

"499.30 Distribution of earnings. The directors shall annually dispose of the earnings of the association in excess of its operating expenses as follows:

"To provide a reasonable reserve for depreciation, obsolescence, bad debts, or contingent losses or expenses.

"At least ten percent of the remaining earnings must be added to surplus until surplus equals either thirty percent of the total of all capital paid in for stock or memberships, plus all unpaid patronage dividends, plus certificates of indebtedness payable upon liquidation, or one thousand dollars, whichever is greater. No additions shall be made to surplus whenever it exceeds either fifty percent of such total, or one thousand dollars, whichever is greater.

"Not less than one percent nor more than five percent of such earnings in excess of reserves may be placed in an educational fund, to be used as the directors deem suitable for teaching or promoting cooperation.

"After the foregoing, to pay fixed dividends on stock or memberships, if any.

"All remaining net earnings shall be allocated to a revolving fund and shall be credited to the account of each member including subscribers described in section 499.16 ratably in proportion to the business he has done with the association during such year. Such credits are herein referred to as 'deferred patronage dividends'.

"499.31 Control of allocation by members. The members may at any meeting control the amount to be allocated to surplus or educational fund, within the limits specified in section 499.30, or the amount to be allocated to reserves.

"499.32 Patronage dividends of subscribers. Patronage dividends to subscribers whose stock or membership is not fully paid in cash shall be applied toward such payment until it is completed. If the articles or bylaws so provide, subscriptions not fully paid within two years may be canceled and all payments or patronage dividends thereon forfeited.

\*  \*  \*  \*  \*  \*

"499.34 Patronage dividend certificates. If its articles or bylaws so provide, an association may issue transferable or non-transferable certificates for deferred patronage dividends.

"499.35 Time of payment. Credits or certificates referred to in sections 499.33 and 499.34 shall not mature until the dissolution or liquidation of the association, but shall be callable by the association at any time in the order of priority specified in section 499.33."

The articles of incorporation under which the taxpayer is organized provide in part:

## "Articles VII

### "Distribution of Earnings

"Section 1. The directors shall annually dispose of the earnings of the association in excess of its operating expenses as follows:

"a. Provide a reasonable reserve for depreciation, obsolescence, bad debts, or contingent losses or expenses.

"b. At least ten per cent of the remaining earnings must be added to surplus until surplus equals thirty per cent of the total of all capital paid in as membership fees, plus all unpaid patronage dividends, plus certificates of interest payable upon liquidation. No additions shall be made to surplus whenever it exceeds fifty per cent of such total, or $1,000.00, whichever is greater.

"c. Not less than one per cent nor more than five per cent of such earnings in excess of reserves may be placed in an educational fund, to be used as the directors deem suitable for teaching or promoting cooperation.

"d. If earned, interest will be paid on the Certificates of Interest at the rate of three per cent per annum. Interest shall not be cumulative.

"e. All remaining net earnings shall be allocated to a revolving fund and shall be credited to the account of each member (including subscribers described in Article V, Section 2), ratably in proportion to the business he has done with the association during such year, provided, however, that no such earnings shall be allocated to a revolving fund in a given year if the reserve provided for in Section b hereof is exhausted.

"Section 2. Patronage Dividends of Subscribers. Patronage dividends of subscribers whose membership fee is not fully paid shall be applied upon the balance due on such membership fee until it is paid in full.

"Section 3. Payment of Patronage Dividends. If the by-laws provide, the directors may issue nontransferrable (sic) certificates for deferred patronage dividends, credited as provided in Section 1, Article VII, provided that such credits or certificates shall not mature until the dissolution or liquidation of the association, but shall be callable by the association at any time in the order of priority specified in Article VIII."

The total net income of the taxpayer in the present case for its fiscal year ending October 31st, 1944, prior to federal taxes, was $16,372.53. There was on that date no capital stock outstanding. It had on hand capital paid in for memberships in the amount of $2310. Depreciation in the amount of $775.14 was set aside for the fiscal year ending October 31st, 1944. In accordance with the policy of previous years, no sum was set aside for educational purposes. No reserves for contingent losses or expenses had been etablished on the ground that the facts did not justify such a reserve. There was no showing that additional reserves were needed for purposes stated other than those for which taxpayer had provided. Taxpayer's surplus on November 1st, 1943, amounted to $40,169.10 and remained unimpaired and intact throughout the fiscal year in question and as of October 31st, 1944, it was $50,311.40. It is undisputed that after deduction for federal taxes (including the taxes involved in this action and other non-disputed items) the taxpayer had unencumbered net earnings of $6791.58. The patronage dividend in question in the amount of $5913.14 was allocated against that unencumbered balance.

█ As stated above, taxpayer was on the accrual basis of accounting and thus reports its income in the fiscal period in which it is earned, whether or not received,

and reports any deductions when they accrue, i. e., when taxpayer becomes liable for them, whether or not payment for them has actually been made during a fiscal period. Mobile Drug Co. v. United States, D.C.S.D.Ala.1930, 39 F.2d 940. See also I.T. 1566, C.B. II–1(1923) 85, a portion of which is set out above. Taxpayer may not accrue as a deduction an item the amount of which is unsettled or the liability for which is uncertain. Security Flour Mills Co. v. Commissioner, 1944, 321 U.S. 281, 284, 64 S.Ct. 596, 88 L.Ed. 725. Although the cases cited above deal with deductions, the principles stated therein would appear applicable insofar as the exclusion which is claimed by the taxpayer in the present case.

It is the claim of the taxpayer that under the applicable Iowa statutes and its articles of incorporation it was obligated to make the patronage dividend allocation without further corporate action on its part. It is the claim of the defendant Collector that certain provisions of those statutes and of the articles of incorporation negative and neutralize the obligation which the taxpayer claims to exist.

It will be noted that Section 499.30 of the Code of Iowa 1946, I.C.A., and Article VII of the taxpayer's articles of incorporation, hereinbefore set forth, enumerate the purposes for which taxpayer's board of directors may dispose of the earnings of the taxpayer in excess of operating expenses. It will be noted that both in said statute and in the said articles of incorporation the amount of cooperative earnings that the directors may add to surplus is limited to a definite percentage of the annual earnings and the total amount which taxpayer may carry as surplus is also limited. In addition, the amount that the directors may set aside for an educational fund is limited to a definite percentage of the annual earnings. Since taxpayer was organized as a nonstock cooperative there was no capital stock outstanding, nor did taxpayer have outstanding any interest-bearing certificates of interest. In addition to the above expenditures, the statute and articles of incorporation are substantially alike in providing that, "The directors shall annually dispose of the earnings of the association in excess of its operating expenses as follows: To provide a reasonable reserve for depreciation, obsolescence, bad debts, or contingent losses or expenses."

It is the contention of the defendant Collector that since there is no specified limitation as to the amount or percentage of taxpayer's earnings which may be set aside as a reserve for depreciation, obsolescence, bad debts, or contingent losses or expenses, there is such discretion vested in the board of directors as to render illusory any obligation on the part of the taxpayer to allocate any part of its earnings to its member patrons. It would seem that the claim of the defendant Collector is that such provision in the statute and articles of incorporation is virtually an "open-end" provision. The defendant Collector in support of his position cites cases involving the discretion of directors of ordinary business corporations. The discretion vested in the directors of an ordinary business corporation, even in the absence of any contract or charter provision governing their disposal of profits, is not unlimited and is subject to review by the courts to determine if it is reasonable and sound; though courts will not usually interfere in the absence of an abuse of that discretion by the directors acting in a fraudulent, wanton, oppressive or illegal manner. Liken v. Shaffer 8 Cir., 1944, 141 F.2d 877, 879, certiorari denied 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 605; In re Brantman, 2 Cir., 1917, 244 F. 101, 103; Dodge v. Ford Motor Co., 1919, 204 Mich. 459, 170 N.W. 668, 3 A.L.R. 113; 18 C.J.S., Corporations, § 466, p. 1106. And where the stockholders of a business corporation are entitled to a dividend out of profits by virtue of statute, charter, by-laws, or other agreement, the directors are more closely limited in their discretion. Crocker v. Waltham Watch Co., 1944, 315 Mass. 397, 53 N.E.2d 230; Sexton v. C. L. Percival Co., 1920, 189 Iowa 586, 177 N.W. 83; 18 C.J.S., Corporations, § 466, pp. 1112–1113.

The discretion which the directors of a cooperative may assert in disposing of net earnings of the cooperative is seemingly subject to greater restraints than those im-

posed upon the directors of ordinary business corporations. Seldom is there an express formula for the distribution of the earnings of an ordinary corporation. On the other hand the statute and charter or by-laws of the cooperative usually provide a definite formula and order for the disposal of the earnings of a cooperative. A failure to follow the prescribed order has been held to be beyond the power of the directors. Gallatin Farmers Co. v. Commissioner, 9 Cir., 1942, 132 F.2d 706. Doss v. Farmers' Union Co-operative Gin Co., supra, is contra on slightly different facts. The Iowa Attorney General has ruled that the use of the term "shall" in that portion of Section 8512.30 of the Code of Iowa 1939 (Section 499.30 of the Code of Iowa 1946, I.C.A.) providing for the allocation of cooperative net earnings to a revolving fund for member patrons makes the application of the statute mandatory. [1946] Opinions of the Iowa Attorney General, p. 22.

█ It is generally accepted that establishing reserves for depreciation is good business practice. See In re Kaplan's Will, Sur.Ct.1949, 195 Misc. 132, 88 N.Y.S.2d 851, text writers and cases cited 88 N.Y.S. 2d at page 860. The amounts which may be set aside as "reasonable reserves" for depreciation, obsolescence, bad debts, or contingent losses or expenses, though differing in each individual case, have for federal income tax purposes been rather well limited by Section 114 of the Internal Revenue Code, 26 U.S.C.A. § 114, which establishes the basis for depreciation and depletion of any property subject to such charges, and Treasury Bulletin F which sets out approved rates of depreciation for numerous items. Where questioned, the burden of reasonableness is on the association. Fertile Co-operative Dairy Ass'n v. Huston, 8 Cir., 1941, 119 F.2d 274, 277. The by-laws of petitioner cooperative in Producers Crop Improvement Ass'n v. Commissioner, 1946, 7 T.C. 562, provided that petitioner's directors could set aside "reasonable and adequate reserves" before paying stock dividends or patronage dividends. In spite of this provision, the Tax Court allowed petitioner a patronage dividend ex-

clusion. It should be noted that Section 499.31 Code of Iowa 1946, I.C.A., provides, "The members may at any meeting control the amount to be allocated to surplus or educational fund, within the limits specified in section 499.30, or the amount to be allocated to reserves."

█ An obligation not capable of being enforced would be illusory in character. It has been held that where a cooperative wrongfully refuses to pay over a patronage dividend where an obligation to distribute it exists, the patron may bring an action to force the cooperative to distribute the patronage dividend. Rhodes v. Little Falls Dairy Co., Sup.Ct., 1930, 230 App.Div. 571, 245 N.Y.S. 432, affirmed 1931, 256 N.Y. 559, 177 N.E. 140. See Midland Cooperative Wholesale, 1941, 44 B.T.A. 824, 832. See also O'Connor v. Home Savings & Loan Ass'n, 1938, 224 Iowa 1127, 278 N.W. 636, where a deviation from the statutory rights of members in a savings and loan association, allegedly made in good faith and for good motives, was held an abuse of discretion by the directors. It would seem that under the Iowa statute the discretion which the directors of an Iowa cooperative may exercise in disposing of its earnings is of a limited nature. The next question is whether even that limited discretion renders illusory the right of member patrons of the taxpayer to enforce the allocation of a patronage dividend. In the present case the board of directors of the taxpayer were, under the statute referred to and by its articles of incorporation, limited to expending a "reasonable reserve" for the purposes referred to. It is believed that a "reasonable reserve" under that statute and the taxpayer's articles of incorporation would be a reserve in accordance with prudent business practice. In the very recent case of Farmers and Merchants Bank of Ceresco, Neb., v. Commissioner, 8 Cir., 1949, 175 F.2d 846, the United States Court of Appeals for the Eighth Circuit in an analogous situation held that what amounts might be withheld by bank officials on the basis of prudent banking was "judicially testable." In that case, the Court, in reversing a decision of the Tax Court sustaining assessments made by the Commis-

sioner against the bank, held that a distribution of earnings by the bank to its former depositors pursuant to a reorganization agreement entered into the prior year could be excluded from the bank's taxable income. The reorganization agreement was held to create an obligation on the part of the bank to its former depositors who were said to have an "equitable lien" on the earnings of the bank. The Court went on to add, 175 F.2d at page 849, of the opinion, "What amount the bank had to set aside out of its earnings to satisfy statutory requirements would be readily establishable. Any right of the bank to withhold more, if it attempted to do so, on the basis of prudent banking in relation to its situation would also be soundly testable, to the extent at least of evidentially resolving the bank's arbitrariness or good faith in relation to the obligation of the agreement." The limitation imposed in that case upon the discretion of bank officials appears comparable to the limitations imposed upon the directors of the taxpayer in the present case.

■ In connection with the matter of the obligation of the taxpayer in the present case to allocate a portion of its earnings as a patronage dividend, it was stipulated that the patronage dividend included the sum of $1450.40 which represented profits derived from transactions with those present members of the taxpayer who transacted business with the taxpayer for the period from November 1st, 1943, to February 8th, 1944, during which time it functioned as an ordinary stock corporation. During that period the obligation of the taxpayer was to pay its stockholders dividends on the basis of their stockholdings rather than to pay members dividends on the basis of their patronage. On the right of stockholders of an ordinary business corporation to dividends out of accumulated profits of such corporation see, Cannon v. Wiscassett Mills Co., 1928, 195 N.C. 119, 141 S.E. 344; Holcomb v. Forsyth, 1927, 216 Ala. 486, 113 So. 516; Burk v. Ottawa Gas & Electric Co., 1912, 87 Kan. 6, 123 P. 857, Ann.Cas. 1913D, 772; Siegman v. Electric Vehicle Co., 1907, 72 N.J.Eq. 403, 65 A. 910; Belfast & M. L. R. Co. v. City of Belfast, 1885, 77 Me. 445, 1 A. 362. Since dividends of ordinary business corporations based upon stock ownership are not excludable from the gross income of such corporations for federal income tax purposes, it would seem that the taxpayer in the present case cannot exclude the sum of $1450.40 from its gross income for federal income tax purposes. It would seem that patron membership in the taxpayer after February 8th, 1944, would not be retroactive to the period between November 1st, 1943, and February 8th, 1944, and that the profits received by the taxpayer during that period of time in legal effect represent profits from transactions with nonmembers, which under the applicable Iowa law are not subject to allocation as a patronage dividend. Deducting the said sum of $1450.40 from the $5913.14 allocated by taxpayer as a patronage dividend, leaves in question the status of the balance of the amount allocated as a patronage dividend in the sum of $4462.74, which was derived from profits of the taxpayer on business transacted with it by member patrons between February 8th, 1944, and October 31st, 1944. It is the view of the Court that the said sum of $4462.74 meets the conditions for exclusion contained in the Treasury Department rulings cited supra.

■ According to the defendant Collector's figures in the present case, it appears that approximately 57 percent of the taxpayer's earnings were derived from transactions with member patrons and the balance of 43 percent was derived from transactions with nonmembers. In addition to other points of dispute noted above, the parties are in dispute regarding the computation of the amount that was subject to allocation, because of the feature of nonmember business. It is the contention of the defendant Collector that the taxpayer could allocate as a patronage dividend only 57 percent of its earnings after making provision for the payment of federal taxes. Taxpayer disagrees with this contention. The United States Board of Tax Appeals has held that for purposes of computing a patronage dividend the percentage figure representing member business may be applied to the cooperative's net income with-

out reduction on account of federal taxes. Farmers Union Cooperative Exchange v. Commissioner, 1940, 42 B.T.A. 1200, 1201. Such holding is in accord with A.R.R. 6967, C.B. III–1 (1924) 287, which establishes a formula for the computation of patronage dividends. See, Valparaiso Grain & Lumber Co. v. Commissioner, 1941, 44 B.T.A. 125, 127. This ruling provides that from the net income of the cooperative there shall be deducted the fixed dividend on stock paid or payable in order to arrive at the "apparent net profits." The amount available for refund is that proportion of the apparent net profits, after deducting the fixed dividend on outstanding capital stock, which the amount of business transacted with members bears to the entire amount of business transacted. Up to this amount a distribution by a cooperative to its members on the basis of business done is said to be a true patronage dividend and excludable in computing taxable income. As stated above, the apparent net profit figure does not have to be reduced by federal taxes and penalties before calculating the amount available for refund.

A closely related problem to the taxation of patronage dividends actually distributed, and a problem of particular importance in Iowa, is the taxability of those amounts which the cooperative merely credits to a patron's reserve account. Patronage dividends actually distributed, whether in the form of cash, capital stock, certificates of indebtedness or notes, as well as those net margins of the cooperative distributed to capital reserves and merely credited or allocated to patrons under a pre-existing obligation are presently excludable from gross income. San Joaquin Valley Poultry Producers' Ass'n v. Commissioner, supra; United Cooperatives, Inc., v. Commissioner, supra; Midland Cooperative Wholesale v. Commissioner, supra; G. C. M. 17895, supra; I. T. 3208, supra. However the Treasury Department rule is that a certificate of interest or prompt notice to the patrons is required where a mere credit to patrons is entered on the books of the cooperative. Letters from Commissioner to Nat'l Council of Farmer Cooperatives in Hearings

before Committee on Ways and Means on Proposed Revisions of the Internal Revenue Code, 80th Cong., 1st Sess., 2619, 2620 (1947). This is upon the theory that credits so made pursuant to contractual authority are actually capital contributions by the contributing patrons. That conclusion would seem to be based upon two assumptions, constructive receipt and constructive reinvestment. Cf. Weil v. Commissioner, 2 Cir., 1949, 173 F.2d 805, on the doctrine of constructive receipt of income. In Midland Cooperative Wholesale v. Commissioner, supra, the Board of Tax Appeals allowed the cooperative to exclude such reserves since they were withdrawable at the will of the patrons. Whether such reserves would be allowed as exclusions if they were not subject to immediate withdrawal by patrons, as they usually are not, has not been decided by the courts. Assets specifically furnished to an organization for capital purposes are not income to that organization. Edwards v. Cuba Railroad Co., 1925, 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124. But funds received as income do not become capital from the standpoint of computing income taxes simply because an organization has elected to regard the funds as capital. Cooperative Oil Ass'n v. Commissioner, supra; Creasey Corp. v. Helburn, D.C.W.D.Ky.1932, 57 F. 2d 204.

Reference is made in House Report No. 1888, supra at p. 18, and in Paul, The Justifiability of the Policy of Exempting Farmers' Marketing and Purchasing Cooperative Organizations from Federal Income Taxes, 29 Minnesota Law Review 343, 370 fn. 112 to a Treasury Decision of November 23d, 1943, aff'd February 22d, 1944, which makes these patronage dividends or refunds taxable to the patron though such refunds are only credited to the patron's account on the books of the cooperative. It has been stated that to the extent the exclusion of such reserves is allowed, income is probably escaping taxation entirely, for a patron usually does not regard such a credit on the books of the cooperative as income to him and thus does not report it in his income tax return. House Report No. 1888, supra at p. 18; 33 Min-

nesota Law Review 785, 794 (1948); 13 Law & Contemporary Problems 403, 417, 431, 438, 526, 527, 533, 545, 546, Duke University (1948).

It should be noted in this connection that the so-called "Iowa ruling" (I.T. 3208, C.B.1938–2, 127) hereinbefore set forth, distinguishes between ordinary patronage dividends or refunds and the type of patronage dividends provided for by the Iowa Code. Section 499.30 of the Code of Iowa 1946, I.C.A., does not allow cooperatives actually to make patronage dividend payments but provides that excess net earnings shall be allocated to a revolving fund and credited to members in proportion to business transacted. Only member patrons may be credited with these "deferred patronage dividends," which are said to be contributions to capital by the member patrons and on this basis are excludable from the gross income of the cooperative, and includable by the member patrons in their returns. In the present case the patronage dividend in question was allocated by crediting the accounts of the member patrons in a patronage ledger maintained by the taxpayer. Under the Iowa statute and the so-called "Iowa ruling" based on that statute, that was the only proper way for the taxpayer to handle the patronage dividend.

It is the holding of the Court:

1. That the Treasury Department rulings providing that under certain conditions a cooperative may exclude from its gross income for federal income tax purposes amounts allocated as patronage dividends are not so unreasonable or so plainly inconsistent with the Internal Revenue Code as not to be followed.

2. That $4462.74 of the $5913.14 patronage dividend in question in this case met those conditions.

3. That $1450.40 of the $5913.14 patronage dividend in question in this case did not meet those conditions.

The sum of $4462.74 referred to in holding (2) represents that portion of the patronage dividend derived from taxpayer's transactions with its member patrons after its reorganization as a nonstock cooperative on February 8th, 1944. The sum of $1450.40 referred to in holding (3) represents that portion of the patronage dividend in question arising from taxpayer's earnings from November 1st, 1943, to February 8th, 1944, when it was functioning as a stock corporation.

It should be noted that the motion providing for the allocation of the patronage dividend in question established the following formula for the allocation of the dividend among taxpayer's member patrons, "a cent a bushel on grain eight percent on merchandise and six-tenths of one percent on livestock." It has been heretofore noted that some writers claim the application of the term "patronage dividends" to allocations to marketing and consumer patrons alike makes for confusion. Section 499.30 of the Chapter of the Iowa Code under which the taxpayer was reorganized on February 8th, 1944, as well as its own articles of incorporation provide for "patronage dividends" to be credited "ratably in proportion to the business * * * done" by the member patrons. These provisions would seem to make no distinction between marketing patrons and consumer patrons for patronage dividend purposes. These provisions would also seem to set up but one formula for the allocation of a patronage dividend. In the allocation made by the taxpayer in the present case those patrons marketing corn were credited with a fixed sum on a commodity unit basis, i. e., one cent per bushel; those patrons marketing livestock were credited with a definite percentage on a dollar volume basis, while consumer patrons were credited with a different fixed percentage on a dollar volume basis. Since no issue as to that matter was raised, this Court does not pass upon the question as to whether the formula used by the taxpayer in making the allocations to its member patrons was in accord with Section 499.30 and its own articles of incorporation. The holding of this Court in holding No. (2), supra, is only to the effect that the sum of $4462.74 was, as a whole, excludable from the gross income of the taxpayer for fed-

eral income tax purposes, and is not to the effect that the said sum of $4462.74 was credited among the member patrons according to the proper formula.

Judgment will be entered in accordance with this opinion.