*Decision will be entered under Rule 50.*

CLOVER FARM STORES CORPORATION (AN OHIO CORPORATION), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30304. Promulgated February 6, 1952.

*Samuel G. Wellman, Esq.*, and *Irwin N. Loeser, Esq.*, for the petitioner.

*A. J. Friedman, Esq.*, for the respondent.

1276

## OPINION.

RAUM, *Judge:* Petitioner is a corporation organized for profit, and does not claim to be exempt from taxation under section 101 or any other provision of the Internal Revenue Code. It does contend, however, that its gross income must be reduced by patronage dividends which it paid to its stockholder-members, and the Commissioner does not disagree that such reduction is proper, provided that the amounts involved are true patronage dividends.

The concept that "patronage dividends" paid by a corporation may operate to reduce its gross income (or constitute a "deduction" therefrom) is not founded upon any specific statutory provision. However,

the concept has been recognized for a number of years,[2] and it apparently rests upon the theory that such dividends are in reality rebates or refunds upon business transacted by the corporation with its stockholders or members, where it was committed to make such refunds, and that the amounts thus repaid never should have been included in income in the first instance.

The Commissioner has allowed petitioner to reduce its gross income to the extent that the amount paid by it to its stockholder-members was allocable to the $58,550.23 which it had received from them for sales of labels and other materials. But his proposed deficiency is based upon refusing similar treatment with respect to that portion of the alleged patronage dividend allocable to the $122,468 received from its stockholder-members in connection with its fee of $1 a week per retailer for "regular services" under section 3 of the Wholesale Franchise Agreements. Thus, the sole question presented to this Court for decision is whether the patronage dividend, to the extent in controversy, was a "true" patronage dividend.

The Commissioner contends that it was not a true patronage dividend because: (1) the $122,468 had really been received by petitioner *from the retailers* in payment for services rendered to them by petitioner, and therefore to the extent that the patronage dividend was based upon that amount it did not constitute a rebate to its stockholder-members on any sales prices or service charges which they had previously paid to petitioner, but did constitute rather a distribution of net profits; and (2) the amount so distributed was not distributed pursuant to a definite pre-existing obligation between petitioner and its stockholder-members.

True patronage dividends include only those amounts which the taxpayer is required to return to its members as rebates or refunds on business transacted with such members. Any profits made on business transacted with nonmembers which may be distributed to members are fully taxable. See A. R. R. 6967, III–1 C. B. 287, 289; *Valparaiso Grain & Lumber Co.*, 44 B. T. A. 125, 126, 127. Petitioner's members were its wholesalers, and the amount rebated or distributed to them at the close of the taxable year ended December 31, 1948, included profits made by it on business transacted with nonmembers and profits made by it on business transacted with the wholesalers. The

---

[2] See, *e. g., Anamosa Farmers Creamery Co.*, 13 B. T. A. 907; *Midland Cooperative Wholesale*, 44 B. T. A. 824; *United Cooperatives, Inc.*, 4 T. C. 93; *Colony Farms Cooperative Dairy, Inc.*, 17 T. C. 688; *Dr. P. Phillips Cooperative*, 17 T. C. 1002; *Cooperative Oil Assn., Inc.* v. *Commissioner* (C. A. 9), 115 F. 2d 666, 668; *Uniform Printing & S. Co.* v. *Commissioner* (C. A. 7), 88 F. 2d 75, 76; *Farmers Cooperative Co.* v. *Birmingham* (N. D. Ia.), 86 F. Supp. 201; I. T. 1499, I–2 C. B. 189; S. M. 2595, III–2 C. B. 238; G. C. M. 12393, XII–2 C. B. 398; G. C. M. 17895, 1937–1 C. B. 56; I. T. 3208, 1938–2 C. B. 127.

respondent determined that only $58,550.23 of the total income received by petitioner during the taxable year was derived from business transacted with its members. The petitioner contends that, in addition to this $58,550.23, the sum of $122,468 (or the total amount of $181,018.23) was derived by it from business transacted with such members.

The parties are in apparent agreement that the disputed sum of $122,468 was physically received by the petitioner from the wholesalers during the taxable year. The position of the respondent is in substance, however, that the wholesalers merely acted as conduits for receiving $1 per week from each retailer in their respective territories, in exchange for services rendered each retailer by petitioner, and passing it on to the petitioner. The fact that under the terms of the Retail Franchise Agreements each retailer agreed to pay his wholesaler $1 per week and that the amounts paid by the retailers to the wholesalers, assuming that the terms of the agreements were fully performed, would have totaled $122,468 (the amount which petitioner claims it received during 1948 from business transacted with the wholesalers) would seem to indicate that there is a superficial basis for respondent's position. An analysis of all the facts leads us to a different conclusion.

The respondent's theory is bottomed upon the premise that the services rendered by the petitioner were of the type and kind intended exclusively for the use of the retailers and not the wholesalers, and that what petitioner really did was sell its services to the retailers and receive payment from them. That some of the services, indeed a significant portion of them, rendered by petitioner were intended to and did help the retailers is undoubtedly true. This follows from the fact that one of the objects of the plan under which the petitioner operated was devised by a wholesaler and adopted by other wholesalers to enable retailers who were customers of the wholesalers to meet chain store competition. But the wholesalers formed the petitioner to perform services for them. They and not the retailers were its customers, and they and not the retailers were bound by contract to pay for the services rendered. Their apparent purpose in organizing the petitioner was to get certain expert advice, assistance, and services by collective action which they could not afford to purchase individually. Although there was some overlapping, the services which petitioner was required to render and did render to them pursuant to section 3 of the Wholesale Franchise Agreements were not the same as those which they were required to render and did render under the terms of the Retail Franchise Agreements. As shown by our findings, petitioner rendered a variety of services that were exclusively for the benefit of its wholesalers, and the wholesalers, in turn, rendered a variety of services to its retailers that were not in-

cluded in the services originating with the petitioner. Our conclusion is that the payment of $122,468 which petitioner received during the taxable year from its wholesaler-members was for services which it rendered to them. In these circumstances, the fact that they contracted for and received from their retailers an equivalent amount for services rendered by them to such retailers provides no basis for the application of respondent's conduit theory.

The respondent urges that even though the payments in controversy were received by petitioner for services rendered to the wholesalers, it still may not prevail in its claim to the exclusion for the reason that it has not shown that its stockholder-members unqualifiedly had the right to and did receive the net profits arising from the sale of such services. His argument in support of this contention is that under the provisions of article V of the Agreement of Merger the board of directors of petitioner had the power to withhold any part of its earned surplus and place all of it at the risk of the business rather than distribute part of it to the patron members as patronage refunds. Thus, according to the respondent, the petitioner never ceased to lose control over funds coming into its possession; the allocation of any amount to the patronage refund account was within the discretion of the directors; and, since petitioner thus had the power to treat all funds as its own, no part thereof ever really belonged to its patron members.

The portion of article V of the Agreement of Merger relied upon by the respondent is set forth in our findings. It grants to petitioner's board of directors authority regarding the use or disposition of petitioner's "surplus" once it has been created. The difficulty with this contention is that article VIII of petitioner's Code of Regulations, which has "all the force and effect of a contract between the corporation and its members" (*State* v. *Shaw*, 103 Ohio St. 660, 669, 134 N. E. 643, 646), provides that "At the close of each calendar year, there shall be paid or credited to the Patrons of the Corporation, a Patronage Refund * * *" in an amount equal to the excess of petitioner's gross revenues over its expenses and certain other items specified therein. Thus, to the extent that article VIII was applicable, the corporation was charged with a liability with respect to the amount involved, and it therefore never did become a part of surplus. The provisions of article VIII were mandatory and neither petitioner's board of directors nor its officers had any discretion to determine whether a refund would or would not be made, and petitioner's general manager could not, as respondent urges on brief, have decided, with the approval of the directors, that the entire amount of $48,805.66 set up on petitioner's books at the end of 1948 as a "patronage refund" be retained by petitioner with no distribution to its stockholder-members in cash, stock or otherwise. In

passing a resolution on December 13, 1948, directing the management "to set up as Accounts Payable on the books of the Corporation, any and all other earnings of the corporation, as a Patronage Refund due members as of December 31st, 1948, in accordance with Article VIII * * *," the board of directors merely recognized the preexisting obligation to make the "Patronage Refund." Cf. *United Cooperatives, Inc., supra*, p. 107; *Farmers' Union Co-operative Association*, 13 B.T.A. 969. This corporate action was not required to be taken before petitioner became definitely liable to make the patronage refund to its stockholder-members.

The respondent erred in his determination that the profits resulting from the payments of $122,468 made to petitioner by its wholesaler-members should be included in its taxable income for the year 1948.

*Decision will be entered under Rule 50.*